606 F.Supp. 423 (1985)
Joseph J. AUDET, Plaintiff,
v.
BOARD OF REGENTS FOR ELEMENTARY AND SECONDARY EDUCATION and J. Troy Earhart, in his capacity as Commissioner of Education for Elementary and Secondary Education, Defendants.
Civ. A. No. 84-0354 S.
United States District Court, D. Rhode Island.
April 5, 1985.
*424 James J. Mullen, Barrington, R.I., for plaintiff.
Forest L. Avila, Legal Counsel, R.I. Dept. of Educ., Providence, R.I., for defendants.

OPINION AND ORDER
SELYA, District Judge.
Invoking this court's federal question jurisdiction, 28 U.S.C. §§ 1331, 1343(3), the plaintiff, Joseph J. Audet, a teacher in the Cumberland, Rhode Island school system and a frondeur of sorts, seeks declaratory and injunctive relief and ancillary redress against the state Board of Regents for Elementary and Secondary Education (Board) and J. Troy Earhart, in his capacity as the state's commissioner of elementary and secondary education (Commissioner).
In his amended complaint, Audet challenges on due process, U.S. Const.Amend. XIV, and involuntary servitude, U.S. Const. Amend, XIII, grounds the defendants' administration of a state statutory and regulatory scheme involving teacher certification. The Board, a creature of the state legislature, see R.I.Gen.Laws § 16-60-1 (1981), is a public corporation which has been given sweeping powers to manage the course of elementary and secondary education within the state. E.g., R.I.Gen.Laws § 16-60-4 (1981). These powers specifically include the authority "(t)o adopt standards and qualifications for the certification of teachers and to provide for the issuance of certificates...." Id. at 16-60-4(9)(b). The Commissioner is appointed by, and serves as the "chief executive officer" of, the Board. R.I.Gen.Laws § 16-60-6 (1981). He doubles in brass as the ranking administrator of the state's department of elementary and secondary education.
Subsequent to the commencement of this action in July of 1984, a series of conferences was held between counsel for the parties and the court. On December 11, 1984, a consent order was entered establishing a briefing schedule and providing for the submission of the controversy to the court, jury-waived, as a case stated. An agreed statement of facts and an assortment of documentary evidence was filed pursuant to the stipulation; briefs followed; and oral argument was heard on February 11, 1985. This rescript constitutes the court's findings of facts and conclusions of law in pursuance of Fed.R. Civ.P. 52(a).

I. THE CERTIFICATION PROCESS.
Although the precise form of the legislative command has varied over time, Rhode Island has attempted since at least the nineteenth century, e.g., P.L. 1898, ch. 544, § 9, to safeguard the education of the young by insuring the calibre of those employed to teach. The current version of this initiative provides in material part that

*425 No person shall be employed to teach, ... in any school supported wholly or in part by public money unless such person shall have a certificate of qualification issued by or under the authority of the [Board].
R.I.Gen.Laws § 16-11-1 (1981 reenactment).
Such certificates are customarily issued upon compliance with sundry educational and experiential requirements, followed by satisfactory completion of an examination process. R.I.Gen.Laws § 16-11-2. But, certificates may be awarded, in certain circumstances, under a less rigorous procedure. Id. at § 16-11-3. The implementation of this protocol has been delegated to the Commissioner, subject to the Board's overall approval of generic standards and qualifications. Id. at § 16-60-6(9)(b). The Commissioner, in turn, has promulgated detailed regulations (Regulations) anent certification procedures. The Regulations are of record here. They have remained constant, by and large, over time.
The Regulations provide for the issuance of several types of teaching certificates: provisional, temporary provisional, special provisional, substitute, student teacher, emergency, and the like. Regulations at Art. II. The most prestigious of these is the "professional certificate." Such commendations are issued "in all areas of certification and are valid for life." Id. Certificates are granted only upon application of the interested individual. E.g., id. at Art. IV.
The printed Regulations make no formal provision for the annulment, surrender, or cancellation of professional certificates, once issued (although the governing statute, R.I.Gen.Laws § 16-11-4, does contemplate the existence of such rules in the case of annulment "for cause").[1] There is no kindred legislative command as to the promulgation of guidelines for the voluntary relinquishment of professional certificates.

II. FACTS.
As indicated above, the facts are not in serious dispute. And, they are susceptible to succinct summarization.
Audet has served as a docent since 1960, and has taught in the Cumberland public school system since 1964. From 1960 to 1964, he conducted classes in science, biology, and junior business for the Lincoln public schools. He then shifted to the Cumberland system and taught courses in both mathematics and electronics from 1964 to 1969. Audet then became a guidance counsellor in the Cumberland schools. He toiled exclusively in that vineyard until August of 1982. During that period, Audet sought  and received  his master's degree in guidance counselling.
In March of 1973, the Board issued professional certificates to the plaintiff, valid for his lifetime, in the specialties of mathematics, general science, and vocational electronics. He subsequently received a similar professional certificate in guidance on August 1, 1975.
On August 27, 1982, Audet learned from the Cumberland School Department (Department) that he was being involuntarily transferred from his by-then-familiar position in guidance counselling to a teaching assignment in general science. This move was triggered by the automatic application of a state statute which, together with the provisions of a collective bargaining pact, see text post, governed reductions in force anent public school teachers. Under § 16-13-6 of the Rhode Island General Laws:
A school board may, by reason of a substantial decrease of pupil population, within its school system, suspend teachers in such numbers as are necessitated by the decrease in pupil population; provided, however, that such suspension of *426 teachers shall be in the inverse order of their employment unless it is necessary to retain certain teachers of technical subjects whose places cannot be filled by teachers of earlier appointment; and, provided, further, that such teachers as are suspended, shall be reinstated in the inverse order of their suspension. No new appointments shall be made while there are available teachers so suspended.
The then-current collective bargaining agreement, entered into between the school committee and the union which represented Cumberland's teaching personnel (including Audet), Article XXVII, § C.2, explicitly defined the system of "forced bumping" which the state statute plainly envisioned:
"Forced bumping" shall mean that teachers will be suspended based solely on seniority and that the Cumberland School Committee shall cause remaining teachers to be reassigned according to seniority and certification in order to cover all teaching positions. Such reassignments shall be involuntary on the part of such teachers who are affected. Those reassignments necessitated by application of the foregoing shall be considered statutorily required and, therefore, not subject to the provisions of Article XIV of this Agreement ("Involuntary Reassignments and Transfers"). A more senior teacher may be suspended when it is necessary to do so to comply with state certification requirements provided such reassignments otherwise comply with the above. Where alternate complaint reassignments are possible, the School Committee may choose the reassignment which, in its judgment, is in the best interest of the students and the school system.
In practice, the game of musical teachers works somewhat along these lines. A recall list of educators suspended due to declining enrollment or the like is established, with the most recently suspended teacher heading the roster. If a vacancy occurs in, say, a biology classroom, and the first name on the recall list is that of a teacher certified to teach the subject, the matter is straightforward; the topmost teacher is simply moved from the recall list into the available slot. If, however, the person in line for recall is certified to instruct only in history and art, he or she must still be hired. But, state law forbids that the candidate be entrusted with the rigors of teaching biology, inasmuch as he/she lacks the requisite "qualification". See R.I.Gen. Laws § 16-11-1. So, the Department attempts to search out, from among those presently teaching history or art, one who is also certified in biology. If such a versatile person can be located, then he or she is swiftly moved into the existing science vacancy, thereby creating an empty nest in either the history or art classrooms to which the teacher theretofore perched on the top rung of the recall ladder can lawfully fly. Yet, if none of the history or art teachers are certified in biology, but one is qualified to teach mathematics, and a presently employed math instructor is certified to teach biology, the shifting of personnel may involve three, rather than two, assignment transfers. As school administrators scurry to maintain compliance with both aspects of state law  mandated seniority under R.I.Gen.Laws § 16-16-6 and the use of duly qualified persons as required by R.I.Gen.Laws § 16-11-1  the intricacy of the dance can become complicated logarithmically. And, a domino effect results: it may be necessary for a host of teachers to bump one another so that the Department can rehire the most senior person on the lay-off list.
In this case, the August, 1982 notice to Audet was occasioned because the first-ranked teacher on the reinstatement roster was certified in elementary education; her reemployment forced the bumping of a grade-school teacher who bore multiple certification, including guidance counselling. Thus nudged, the latter transferred from the preempted elementary school post to the guidance job which had theretofore been the plaintiff's preserve. As a result, Audet was switched to an assignment in general science (a subject in which he was certified, but which he had not taught for some 18 years). The teacher who was *427 transferred to the guidance position had less seniority, both within the school system and in the area of guidance counselling, than did the plaintiff. Moreover, the shift arguably caused some economic damage: as a guidance counsellor, Audet had received additional funds above his stipulated salary. There is nothing in the record to indicate that the elementary teacher who acquired Audet's job was certified in general science. There is, likewise, no factual predicate sufficient to postulate  or even to hint at  the existence of any irregular scheme aimed at persecuting Audet.
After learning that he had been relegated to the wilds of general science on the basis of his myriad certification, the plaintiff attempted to resign his life certificates in mathematics, general science, and vocational electronics so that, for statutory and contractual purposes, he would be debarred from teaching in other areas, thus rendering it impossible to transfer him from the guidance sinecure. His requests were denied by the Commissioner on the ground that all of the certificates had been properly issued and therefore could not be rescinded. This reasoning was amplified by David Roy, a consultant in teacher certification for the state Department of Education. In a letter dated June 1, 1983, addressed to Robert McGinnis, Cumberland's superintendent of schools, Roy avouched in pertinent part:
The Department of Education will not honor the request of a teacher to delete any area of certification (provisional or professional) provided the certificate was properly issued. A certificate may be deleted if it can be determined that the individual did not qualify for the certificate or if the individual did not request the issuance of the certificate.
Unable to resign his certificates, Audet taught general science (and thereafter mathematics), albeit under protest. But, he did not take his comeuppance lightly, and this litigation ensued.

III. CONTENTIONS OF THE PARTIES.
On July 11, 1984, the plaintiff filed suit in this court, charging a violation of his constitutional rights under 42 U.S.C. § 1983, and requesting a declaratory judgment concerning his self-proclaimed right to relinquish the professional certificates which had been issued to him by the Board. Audet argues that the refusal to permit him to disclaim these credentials constituted an impermissible governmental interference with the due process rights guaranteed to him by the fourteenth amendment, most specifically, the right to pursue his chosen vocation. He also claims that, by refusing to allow educators to jettison professional certificates previously granted, the Board is promoting involuntary servitude, in violation of the thirteenth amendment, particularly where, as here, an instructor is bumped into an area in which he is certified but loathe to teach.
The defendants, though conceding the correctness of Audet's version of the relevant facts, deny that their conduct in any way breached the penumbras of his constitutional guarantees. They assert, to the contrary, that they have acted in a regular manner, consistent with state law and with the integrated realities of school administration and of labor relations. And, they deny that Audet is entitled to judicial balm for his perceived wounds.
Rather than stopping with a bare recitation of what the parties contend, the court deems it advisable to emphasize at the outset what this case is not about. Audet has not challenged either the validity or the construction of the state statute, R.I.Gen. Laws § 16-13-6, which controls the suspension and recall of public school teachers;[2] nor does he quarrel with Article *428 XXVII of the collective bargaining contract between the Department and the plaintiff's union (the Cumberland Teachers' Association) which purports to implement § 16-13-6.[3] Indeed, he concedes that these imperatives have been followed to the letter in his case.
The sole target of this action is the defendants' refusal to permit Audet to resign certain of his lifetime professional certificates. It is this refusal, the plaintiff contends, which has coerced him into teaching a discipline which he does not favor, cost him the additional stipend and other emoluments which inured to his benefit as a guidance counsellor, and resulted in the forfeiture (at least for the time being) of a warm, cozy, and familiar position.

IV. THE MERITS.

A. Overview

Conceptually, the plaintiff's argument is problematic at best. To be sure, Audet's possession of several certificates made him a prime candidate for bumping when a vacancy arose in the Department's ranks. But, the harm was caused  actually, inexorably, and indubitably  by the suasion of the bumping statute, R.I.Gen.Laws § 16-13-6, as it had been interpreted in, and applied through, the collective bargaining agreement. If the practice of bumping was not sanctioned or did not exist, Audet would have no reason to complain of his inability to resign a chosen assortment of his professional certificates.[4] While a successful challenge to the Board's "no resignation" policy would, in this instance, enable the plaintiff to do an end run on both the intendment of § 16-13-6 and on the Court's recent decision in Pennhurst, see note 2 ante, it would not in a broader sense serve the interests of the public, or of the public schools, or of teachers generally. Moreover, Audet's calculated decision to avoid a direct assault on R.I.Gen.Laws § 16-13-6 does highlight the obvious questions about the actual source of the harm. Pennhurst is, in this court's view, not so easily to be skirted. But, because Audet's jeremiad is in any event totally lacking in merit, the court need not grapple with the somewhat abstract and metaphysical haze of inter-sovereign, inter-court comity which hovers over this litigation.

B. The State's Policy

There is no state statute which expressly forbids academicians from resigning professional certificates. Conversely, there is none which cedes such a privilege to teachers as a matter of right. The Commissioner has the power both to standardize practices anent the certification of teachers, R.I.Gen.Law § 16-60-6(9)(b), and to interpret "school law." Id. at § 16-60-6(9)(h). He has consistently interpreted the state statute appertaining to the annulment of professional certificates, R.I.Gen.Laws § 16-11-4, quoted in full in note 1 ante, to read that validity issued certificates must stand. He has never regarded a mere unilateral desire on the holder's part to abandon his or her certificate as "cause" for annulment within the meaning of § 16-11-4. Nor is there any reason for the Commissioner *429 to do so: certification is, in effect, a "Good Housekeeping Seal of Approval," a signal to the institutional world that, in the collective opinion of the Board and the Commissioner, the holder is qualified to instruct in the specialty and at the level in question. If the Commissioner were to allow individual academicians to determine sua sponte whether they were or were not so equipped, the result would be chaos. Certification would lose all meaning, the system of public education (already hard-pressed in many quarters) would be hamstrung, and the public would be sorely disserved.
The Commissioner's administrative determination is entitled to due deference from this court. See Federal Election Commission v. Democratic Senatorial Campaign Committee, 454 U.S. 27, 37, 102 S.Ct. 38, 44, 70 L.Ed.2d 23 (1981); Ford Motor Credit Co. v. Milhollin, 444 U.S. 555, 566, 100 S.Ct. 790, 797, 63 L.Ed.2d 22 (1980); Grand Islander Health Care Center, Inc. v. Heckler, 573 F.Supp. 405, 410 (D.R.I.1983). Here, in a context where the subject matter is intricately related to a multifaceted regulatory scheme directly within the special competence and expertise of the defendants, the measure of deference is great. Cf. Constance v. Secretary of Health and Human Services, 672 F.2d 990, 995-96 (1st Cir.1982). Inasmuch as the persuasive power of the Commissioner's stance is made manifest by the totality of the attendant circumstances and the exigencies of the certification process, and because his determination is a commonsense one which abridges no statutory command, it is not susceptible to attack in this proceeding on non-constitutional grounds.

C. The Plaintiff's Claim of a Liberty Interest

Audet argues that the defendants' refusal to permit him to escape from the perceived bondage of his lifetime professional certificates has deprived him of the liberty to pursue his chosen occupation, thereby doing violence to his fourteenth amendment rights.[5] He bases his argument principally on the language of Justice McReynolds in Meyer v. Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923):
Without doubt, [the liberty guaranteed by the due process clause] denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally, to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men.
In Meyer, however, the teacher was statutorily forbidden to teach German to children younger than the eighth grade, anywhere in the state of Nebraska. That is not the case at bar. Rather than involving an outright and irrational ban, this suit concerns the plight of a teacher who, because of the uniform application of a rationally devised state policy, has lost a particular job in a particular school system. The state has not, directly or indirectly, debarred the plaintiff from employing his skills as a guidance counsellor; it has not revoked or suspended his certification in that specialty; it has not placed him under any stigmatizing cloud. If Audet really prefers to work in the guidance field, there is nothing to prevent him from shifting to another school system or from seeking work in private or parochial institutions. And, again unlike Meyer, there has been no argument whatsoever that the children in the Cumberland schools have been deprived *430 of counselling services as a result of Audet's transfer.
The injury complained of pertains solely to Audet, and consists of his being required to teach science rather than guidance, with a concomitant loss of remuneration. Yet, however telling this injury may appear to him, the Court (speaking more recently than in Meyer) has emphatically "rejected[ed] ... the notion that any grievous loss visited upon a person by the State is sufficient to invoke the procedural protections of the Due Process Clause." Jago v. Van Curen, 454 U.S. 14, 17, 102 S.Ct. 31, 34, 70 L.Ed.2d 13 (1981) (per curiam) (emphasis original). See also Meachum v. Fano, 427 U.S. 215, 224, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976). The question is not merely the weight of the individual's interest, but whether the nature of the interest is one within the contemplation of the liberty or property language of the fourteenth amendment. See, e.g., Jago, 454 U.S. at 17, 102 S.Ct. at 34; Roth, 408 U.S. at 570-71, 92 S.Ct. at 2705-06; Morrisey v. Brewer, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972).
As the Supreme Court has indicated, the analysis of the existence of a liberty interest parallels, but is not exactly the same as, that which pertains to property interests. Jago, 454 U.S. at 17-23, 102 S.Ct. at 34-37; see also Bara v. Aurora Civil Service Commission of the City of Aurora, 580 F.Supp. 212, 214 (N.D.Ill. 1983). It is clear, however, that a complainant must show that a claimed liberty interest is rooted in state law, a well-established understanding between the parties, or a course of conduct which creates substantial limits on the discretion of state officials. Bara, 580 F.Supp. at 214. None of these roots thrive in the barren soil of Audet's amended complaint.
The plaintiff depends upon no shared understanding between the parties. There is nothing to show that, at the time he so avidly sought his seriatim certificates, he had any reason to believe that he could jump the certification ship at will, or that the rules of the certification game have been unilaterally altered to his material detriment. Nor does state law offer any solace: not only are the Commissioner's policies in harmony with, and rationally related to, the scheme of teacher qualification contemplated by the Rhode Island statutes, but those policies are also necessary in order to import flexibility into the management of local school systems and to breathe vitality into the purport of R.I.Gen. Laws § 16-13-6.
Plaintiff's "course of conduct" asseveration is equally unavailing. The right to engage in an occupation must be considered one of the core values of liberty, such that no person can be arbitrarily deprived of it by the government. But, that right is not limitless. Surely, one untrained in the healing arts has no absolute right to set up shop as a physician; even one trained as an attorney cannot practice law in this very court without first meeting the court's requirements. See D.R.I.L.R. 4(a) and (b) (establishing admissions procedures and criteria for eligible attorneys). Moreover, the facts in this case  even surveyed from different angles  simply do not fit in the liberty interest mold.
Audet is not really asserting a right to engage in a given occupation, but rather a right to a particular job in the Cumberland school system. And, the right to engage in a vocation is not a guarantee of job security.[6]See, e.g., Hughes v. Whitmer, 714 F.2d 1407, 1414 (8th Cir.1983) cert. denied, ___ U.S. ___, 104 S.Ct. 1275, *431 79 L.Ed.2d 680 (1984); Bryan v. Werner, 516 F.2d 233, 240 (3rd Cir.1975). While one clearly has the right to aspire to teach guidance, one does not necessarily have the right to a job teaching guidance. To the extent that a person has a vested interest in a specific post, that interest has been clearly defined as a property interest. See, e.g., Bishop v. Wood, 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976); Arnett v. Kennedy, 416 U.S. 134, 151-52, 94 S.Ct. 1633, 1642-1643, 40 L.Ed.2d 15 (1974); Perry v. Sindermann, 408 U.S. 593, 599-602, 92 S.Ct. 2694, 2698-2700, 33 L.Ed.2d 570 (1972); Roth, 408 U.S. at 577-78, 92 S.Ct. at 2709-10. This plaintiff, however, has never claimed that either state law or the provisions of the Cumberland teachers' contract gave him tenure/security in the guidance counsellor's position; to the contrary, he has expressly disclaimed any intention of arguing that his property interests have been transgressed. See note 5, ante.
Equally, it is difficult to grasp how the Board's refusal to permit Audet to resign his lifetime certificates arbitrarily deprived him of the right to pursue the calling of his choice. The effect of the demurrer was simply to indicate the Commissioner's abiding (previously documented) belief that Audet remained qualified to instruct in several subjects apart from his preferred specialty. A licensed plumber who had earlier been admitted to the bar is certainly not "prevented" from fixing toilets by the fact that the state continues to acknowledge his qualifications to practice law. So here: Audet was hardly inhibited from being a guidance counselor merely because he retained teaching certificates in science, mathematics, and vocational electronics. The resulting impairment of his particular job prospects is, for purposes of this case, relevant only in the context of the bumping statute; and the plaintiff has specifically eschewed any challenge to the sweep of R.I.Gen.Laws § 16-13-6. See text ante at Part III. At bottom, neither the continued possession of multiple certificates, under protest, nor the rigors of § 16-13-6, has deprived Audet of his freedom to be a guidance counselor. The plaintiff has been, and remains, unreservedly at liberty to seek out and to find a counselling position. And, he miscasts the federal district court in the role of his personal employment agency in this regard.
Audet's answer to these overwhelmingly self-apparent truths are both paralogical and beside the point. He laments that he has invested over twenty years of service in the Cumberland school system with all the seniority, pension, and status benefits that such longevity implies. That is true but wholly irrelevant. He (and his fellow teachers) are as much bound by the collective bargaining agreement as is the Department. He has enjoyed the fruits both of his hybrid certification and of the union pact. He cannot now disown the pits.
The bumping statute and the Commissioner's no resignation policy, together, have indeed presented Audet with an Hobson's choice between a less satisfying job assignment with the Department or counselling work for an untried employer. It may not be easy for the plaintiff to find another guidance position; and if he does find one, it may entail a lesser salary, a move to another area, and all the discomfiture associated with any new job. Yet, however irksome this choice may seem, it is a familiar one to many Americans. Executives are shunted to less desirable locales so that the corporate conglomerate may prosper; military men are relegated to supply depots so that younger officers may lead; lawyers are taken off high profile cases and moved into dry-as-dust regulatory practice. While such workplace decisionmaking may be frustrating, and even shortsighted on the employer's part, it is simply not the stuff of unconstitutionality. The Constitution protects the basic liberties of the citizenry: it safeguards the rights of both the employer and the employee. It cannot be construed as a wellspring of tenure for every employee, in every circumstance, or as a guarantee that a worker may keep his job, irrespective of his employer's needs or wishes, merely because he prefers to do so.
*432 At the end of the blind alley into which Audet's quest has led him, it is worth noting anew both the accepted underpinnings of a constitutionally-protected liberty interest and their total absence in terms of this case. None of these factorsstate law, the understanding of the parties, or a course of conduct limiting the discretion of state officialsbuttress the plaintiff's claim of a liberty interest in the guidance position; to the contrary, all of them actually militate in favor of the Department's ability to reassign teachers as was done in this case. Audet's hold on his job was conditioned on both the bumping statute and the collective bargaining agreement which interpreted it. Thus, whatever rights he had were at all times subject to the eventuality that he would be bumped. And, in the occurrence of precisely that eventuality, no constitutional violation can lurk. Cf. Arnett, 416 U.S. at 151-52, 94 S.Ct. at 1642-43.

D. The Plaintiff's Claim of Involuntary Servitude

Audet alternatively contends that because he has been unable to discard his unwanted professional certificates, he has been coerced into teaching subjects he does not wish to teach. Such oppression is, in his view, tantamount to being condemned to involuntary servitude. It must be noted, of course, that the same problem of cause and effect which plagued the plaintiff's liberty argument permeates this claim as well. To the extent (if at all) that Audet has been forced to teach science and mathematics against his will, that fact must be attributed to the operation of R.I. Gen.Laws § 16-13-6 and its implementation by the collective bargaining agreement. These precipitating factors combined with Audet's multiple certification to place him in less attractive climes. It is conceptually very difficultindeed, well nigh impossibleto see how the defendants' declination of Audet's invitation to repossess his certificates operated to shackle him in a constitutional sense. (There is no record support for an argument that the Commissioner arbitrarily turned thumbs down on Audet's relinquishment request in order to force the exact result which transpired here.)
And, as to the involuntariness question, though the plaintiff may not now wish to teach science and mathematics, he did once seek those certificates. There is nothing to suggest that his volition was inhibited at the time. It was in his self-interest to be qualified in several specialties and he therefore sought out the safe harbor of multiple qualification. He chose, and pursued, the areas wherein he desired the Commissioner to endorse his credentials. He applied for the Commissioner's imprimatur because he deemed it expedient to do so. He knew the rules. He was given no assurance at the time that he could cut loose the certificates at his pleasure. This history makes it difficult to swallow the notion that mathematics and science are subjects entirely repugnant to the plaintiff. It seems entirely fair that the same magnetic field to which Audet was attracted in an effort to solidify his teaching career should now dictate his position within the Department.
It comes as no surprise, therefore, that the facts which Audet has marshalled do not support the presence of involuntary servitude as the courts have consentiently construed the reach of the thirteenth amendment.[7] The prophylaxis of that clause, as the plaintiff points out, has not been limited to the classic form of slavery. United States v. Mussry, 726 F.2d 1448, 1451 (9th Cir.) cert. denied, ___ U.S. ___, 105 S.Ct. 180, 83 L.Ed.2d 114 (1984). The purpose of the amendment was "not merely to end slavery but to maintain a system of completely free and voluntary labor throughout the United States." Pollock v. Williams, 322 U.S. 4, 17, 64 S.Ct. 792, 799, 88 L.Ed. 1095 (1944). The unwelcome embrace of involuntary servitude, however, *433 "occurs when an individual coerces another into his service by improper or wrongful conduct that is intended to cause, and does cause, the other person to believe that he or she has no alternative but to perform the labor." Mussry, 726 F.2d at 1453; see also United States v. Harris, 701 F.2d 1095, 1098 (4th Cir.), cert. denied, ___ U.S. ___, 103 S.Ct. 3554, 77 L.Ed.2d 1400 (1983).
In this instance, the Department, faced with a vacancy and a statutory scheme for filling it, acted properly. There have been no allegations that the reinstatement pavane was orchestrated with the specific (malign) intent to waltz Audet out of his wonted guidance cloister and into the less hospitable environs of the science and mathematics classrooms. There is no evidence whatsoever that Audet was bereft of alternatives. More importantly, the defendants in this case (the Board and the Commissioner) did not dictate his reassignment nor force him to teach the subjects which he now finds so distasteful. They had nothing to do with the Department's allocation of its personnel or the negotiation of the collective bargaining agreement. Their refusal to permit the plaintiff to invalidate certain of his professional certificates to serve his own ends was merely a mechanical exercise of a well-settled Board policy of general statewide application. Fairly interpreted, the defendants' actions were designed not to enserf Audet but to preserve the integrity of the certification system.
In considering whether coercion has occurred, the court may consider the background and experience of the plaintiff. See Mussry, 726 F.2d at 1453. Audet is an educated professional, qualified to teach several subjects anywhere in the state of Rhode Island. He is a skilled electrician. He is also a member of a union, which has secured many benefits for him from his employer and which safeguards him from being fired without cause. He is not alien, not illiterate, not unprotected, and not without the ability to free himself. He is, as this case demonstrates, not unable to afford counsel. As the Supreme Court noted over forty years ago:
[I]n general, the defense against oppressive hours, pay, working conditions, or treatment is the right to change employers. When the master can compel and the laborer cannot escape the obligation to go on, there is no power below to redress and no incentive above to relieve a harsh overlordship or unwholesome conditions of work.
Pollock, 322 U.S. at 18, 64 S.Ct. at 799.
Audet's right to change employers has not been affected. As long as he is free to leave, his servitude cannot be involuntary. If held prisoner, he is a captive only of his own myopic view of the Constitution. As the Ninth Circuit has stated:
We recognize that economic necessity may force persons to accept jobs that they would prefer not to perform or to work for wages they would prefer not to work for. Such persons may feel coerced into laboring at those jobs. That coercion, however, results from societal conditions and not from the employer's conduct. Only improper or wrongful conduct on the part of an employer subjects him to prosecution.
Mussry, 726 F.2d at 1453.

V. CONCLUSION.
Inasmuch as Audet's grievance is clearly one against the happenstances of fate namely, a dwindling school age population, the need for lay-offs within the school district, a statutory recall scheme, the exigencies of collective bargaining, the fluke effects of this particular reinstatement, and the fact that his earlier (successful) effort to collect multiple professional certificates has now backfiredthis court cannot sustain his complaint against the defendants. Their general policy at most inadvertently contributed to the plaintiff's present dilemma. What is more, the policy itself is a constitutionally permissible one, rationally related to the state's legitimate educational goals. And, it was applied to Audet in a *434 straightforward, accustomed, and evenhanded manner.
A notable scholar once admonished:
Goe not for every griefe to the Physician, nor for every quarrell to the Lawyer, nor for every thirst to the pot.
The Works of George Herbert (Oxford: Clarendon Press, 1945) at 331.
To those sagacious words it may be added, as Audet's lament so plainly teaches:
Goe not for every bump in the road of life to the Constitution.
Audet's case, having hit several potholes, has irretrievably stalled. The amended complaint misfires on several cylinders, and must be dismissed. Judgment shall enter for the defendants for costs.[8]
It is so ordered.
NOTES
[1] The full text of R.I.Gen.Laws § 16-11-4 is as follows:

The commissioner of education shall promulgate rules and regulations under which a certificate may be annulled for cause. The holder shall be entitled to notice and a hearing before the commissioner of education prior to the annulment of the certificate. The holder shall have an opportunity to appeal the decision of the commissioner to the board of regents, if desired.
[2] The court considers this decision wisely made. The parties have not cited any cases in which the state courts have interpreted the meaning of R.I.Gen.Laws § 16-13-6. In the absence of an authoritative state court construction, and under the Supreme Court's recent decision in Pennhurst State School and Hospital v. Halderman, 465 U.S. 89, 104 S.Ct. 900, 911, 79 L.Ed.2d 67 (1984), this court is not empowered to instruct state officials on how to conform their conduct to state law. This court has no prerogative to jettison principles of federalism and comity in order to decide issues which are properly within the sphere of the state's judiciary.
[3] Public school teachers have the right to bargain on a collective basis with school committees. See R.I.Gen.Laws § 28-9.3-1. The Cumberland Teachers' Association is "the sole and exclusive negotiating or bargaining agent for all of the ... public school teachers [employed by the Department]." Id. at § 28-9.3-3. The collective bargaining pact accepts the principle of forced bumping, and agrees that the resultant reassignments "shall be considered statutorily required." Agreement, Article XXVII, § C. 2. And Audet is, as he apparently recognizes, bound by the majority will as expressed in the collective bargaining accord. Belanger v. Matteson, 115 R.I. 332, 340, 346 A.2d 124, 130 (1975).
[4] In fact, if Audet had had less seniority overall, he might well have been delighted that he could not divest himself of his professional baggage. Multiple certification is clearly a protective hedge designed in part to safeguard both teachers and school systems against a shrinking school age population. Under the Rhode Island paradigm, an educator who has armed himself or herself with a googol of certificates has, in the long run, enhanced job security: he or she is less likely to be laid off in the first place, and more likely to be reinstated more expeditiously in the second place.
[5] While it is unclear whether the plaintiff originally intended to assert that his forced reassignment deprived him of his property interest in the counselling position, he explicitly disavowed any such argument at the February 11, 1985 hearing. And, no constitutionally-protected property interest is readily apparent in these precincts. See Board of Regents v. Roth, 408 U.S. 564, 576-78, 92 S.Ct. 2701, 2708-2710, 33 L.Ed.2d 548 (1972). At best, Audet had a mere expectancy of retaining the guidance post. Thus, this case proceeds solely on the plaintiff's claims of a violated liberty interest and of involuntary servitude.
[6] In Roth, 408 U.S. at 572-573, 92 S.Ct. at 2706-2707, the Court did discuss the plaintiff's claim of constitutional protection in his job in terms of a liberty interest. That liberty interest, however, was defined by implication as the loss of a job accompanied by damage to one's reputation. See Owen v. City of Independence, 445 U.S. 622, 633 n. 13, 100 S.Ct. 1398, 1406 n. 13, 63 L.Ed.2d 673 (1980); Paul v. Davis, 424 U.S. 693, 709-710, 96 S.Ct. 1155, 1164-1165, 47 L.Ed.2d 405 (1976); Limerick v. Greenwald, 666 F.2d 733, 735 (1st Cir.1982); Beitzell v. Jeffrey, 643 F.2d 870, 878 (1st Cir.1981). This plaintiff has made no such compound allegation. And, the agreed facts contain no hint of stigmata.
[7] Congress has enacted several statutes to implement the thirteenth amendment, including 18 U.S.C. § 1581 (holding in peonage) 18 U.S.C. § 1583 (enticement into involuntary servitude), and 18 U.S.C. § 1584 (holding in involuntary servitude). This plaintiff, however, has not alleged anything beyond a naked constitutional violation.
[8] If the court may be permitted an eschatocol of sorts:
 The best of batters strike a slump:
 The minor leagues await 'em;
 The best of teachers take a bump
 When the contract's read verbatim.
 But that's what makes the world go
 round,
 In an ever-changing spree:
 No qualms re bumping have
 been found
 Until bumper becomes bumpee!