JAGO, FORMER SUPERINTENDENT, SOUTHERN
OHIO CORRECTIONAL FACILITY,
ET AL. *v.* VAN CUREN

No. 80–1942. Decided November 9, 1981

PER CURIAM.

After pleading guilty to embezzlement and related crimes, respondent was sentenced by an Ohio court to not less than 6 nor more than 100 years in prison. Under existing law respondent would have become eligible for parole in March 1976. On January 1, 1974, however, Ohio enacted a "shock parole" statute which provided for the early parole of first offenders who had served more than six months in prison for nonviolent crimes. Ohio Rev. Code Ann. § 2967.31 (1975).

Pursuant to this statute, respondent was interviewed on April 17, 1974, by a panel representing the Ohio Adult Parole Authority (OAPA). The panel recommended that respondent be paroled "on or after April 23, 1974," and OAPA subse-

quently approved the panel's recommendation. Respondent was notified of the decision by a parole agreement which stated:

> "The Members of the Parole Board have agreed that you have earned the opportunity of parole and eventually a final release from your present conviction. The Parole Board is therefore ordering a Parole Release in your case." Brief in Opposition 1.

Respondent attended and completed prison prerelease classes and was measured for civilian clothes.

At a meeting six days after the panel's interview with respondent, OAPA was informed that respondent had not been entirely truthful in the interview or in the parole plan that he had submitted to his parole officers. Specifically, respondent had told the panel that he had embezzled $1 million when in fact he had embezzled $6 million, and had reported in his parole plan that he would live with his half brother if paroled when in fact he intended to live with his homosexual lover.[1] As a result of these revelations, OAPA rescinded its earlier decision to grant respondent "shock parole" and continued his case to a June 1974 meeting at which parole was formally denied. Neither at this meeting nor at any other time was respondent granted a hearing to explain the false statements he had made during the April interview and in the parole plan which he had submitted.

After denial of his parole, respondent brought a mandamus action against OAPA. The Supreme Court of Ohio held that OAPA was not required to grant respondent a hearing and that it could not be commanded to recall its decision rescind-

---

[1] In his brief in opposition to the petition for certiorari, respondent does not contest OAPA's conclusion that he misrepresented the amount of his embezzlement to the interviewing panel, and admits "that the total loss was over a million dollars." Brief in Opposition 2. Moreover, respondent admits that his parole plan misrepresented his relationship to the person with whom he planned to live upon release. *Id.*, at 2–3.

ing parole. *State ex rel. Van Curen* v. *Ohio Adult Parole Authority*, 45 Ohio St. 2d 298, 345 N. E. 2d 75 (1976). We denied respondent's petition for certiorari to review the decision of the Supreme Court of Ohio. 429 U. S. 959 (1976).

Respondent then filed a petition for a writ of habeas corpus in the Federal District Court for the Southern District of Ohio, claiming that the rescission without hearing violated his right to due process of law under the United States Constitution. The District Court denied the writ and the United States Court of Appeals for the Sixth Circuit summarily affirmed the denial. *Van Curen* v. *Jago*, 578 F. 2d 1382 (1978). We granted certiorari, vacated the judgment of the Court of Appeals, and remanded for further consideration in light of our decision in *Greenholtz* v. *Nebraska Penal and Inmates*, 442 U. S. 1 (1979). *Jago* v. *Van Curen*, 442 U. S. 926 (1979).

On remand the Court of Appeals in turn remanded to the District Court for further consideration. Applying *Greenholtz*, the District Court determined that "early release in Ohio is a matter of grace" and that Ohio law "is fairly unambiguous that no protectable interest in early release arises until actual release." App. to Pet. for Cert. 24A–25A. Accordingly, the District Court held that the rescission of respondent's parole without a hearing did not violate due process.

On appeal, the Court of Appeals acknowledged that "[p]arole for Ohio prisoners lies wholly within the discretion of the OAPA," and that "[t]he statutes which provide for parole do not create a protected liberty interest for due process purposes." 641 F. 2d 411, 414 (1981). Nonetheless, the Court of Appeals reversed the decision of the District Court. Relying upon language from our decision in *Perry* v. *Sindermann*, 408 U. S. 593 (1972), the Court of Appeals concluded that a liberty interest such as that asserted by respondent can arise from "mutually explicit understandings." See *id.*, at 601. Thus, it held:

> "Having been notified that he 'ha[d] been paroled' and that 'the Board is ordering a Parole Release in your case,' [respondent] had a legitimate expectation that his early release would be effected. This expectation was a liberty interest, the deprivation of which would indeed constitute a grievous loss. It was an interest which could not be taken from him without according [him] procedural due process." 641 F. 2d, at 416.

We do not doubt that respondent suffered "grievous loss" upon OAPA's rescission of his parole. But we have previously "reject[ed] . . . the notion that *any* grievous loss visited upon a person by the State is sufficient to invoke the procedural protections of the Due Process Clause." *Meachum* v. *Fano*, 427 U. S. 215, 224 (1976). In this case, as in our previous cases, "[t]he question is not merely the 'weight' of the individual's interest, but whether the nature of the interest is one within the contemplation of the 'liberty or property language' of the Fourteenth Amendment.'" *Morrissey* v. *Brewer*, 408 U. S. 471, 481 (1972). We hold that the Court of Appeals erred in finding a constitutionally protected liberty interest by reliance upon the "mutually explicit understandings" language of *Perry* v. *Sindermann, supra.*

Our decision in *Sindermann* was concerned only with the Fourteenth Amendment's protection of "property" interests, and its language, relied upon by the Court of Appeals, was expressly so limited:

> "We have made clear in [*Board of Regents* v. *Roth*, 408 U. S. 564, 571–572 (1972)], that 'property' interests subject to procedural due process protection are not limited by a few rigid, technical forms. Rather, 'property' denotes a broad range of interests that are secured by 'existing rules or understandings.' *Id.*, at 577. A person's interest in a benefit is a 'property' interest for due process purposes if there are such rules or mutually explicit

understandings that support his claim of entitlement to the benefit and that he may invoke at a hearing." 408 U. S., at 601.

To illustrate the way in which "mutually explicit understandings" operate to create "property" interests, we relied in *Sindermann* upon two analogous doctrines. First, we compared such understandings to implied contracts:

"[The] absence of . . . an explicit contractual provision may not always foreclose the possibility that a teacher has a 'property' interest in re-employment. . . . [T]he law of contracts in most, if not all, jurisdictions long has employed a process by which agreements, though not formalized in writing, may be 'implied.'" *Id.*, at 601–602.

That the implied-contract aspect of *Sindermann* "understandings" has been limited to the creation of property interests is illustrated by *Bishop* v. *Wood*, 426 U. S. 341 (1976), another property interest case in which we relied upon the "understandings" language of *Sindermann* to conclude that "[a] property interest in employment can, of course, be created by ordinance, or by an implied contract." 426 U. S., at 344 (footnote omitted).

Principles of contract law naturally serve as useful guides in determining whether or not a constitutionally protected property interest exists. Such principles do not, however, so readily lend themselves to determining the existence of constitutionally protected liberty interests in the setting of prisoner parole. In *Meachum* v. *Fano, supra,* we recognized that the administrators of our penal systems need considerable latitude in operating those systems, and that the protected interests of prisoners are necessarily limited:

"Our cases hold that the convicted felon does not forfeit all constitutional protections by reason of his conviction and confinement in prison. He retains a variety of

important rights that the courts must be alert to protect. See *Wolff* v. *McDonnell*, 418 U. S., at 556, and cases there cited. But none of these cases reaches this one; and to hold as we are urged to do that *any* substantial deprivation imposed by prison authorities triggers the procedural protections of the Due Process Clause would subject to judicial review a wide spectrum of discretionary actions that traditionally have been the business of prison administrators rather than of the federal courts." 427 U. S., at 225.

We would severely restrict the necessary flexibility of prison administrators and parole authorities were we to hold that any one of their myriad decisions with respect to individual inmates may, as under the general law of contracts, give rise to protected "liberty" interests which could not thereafter be impaired without a constitutionally mandated hearing under the Due Process Clause.

The second analogy relied upon in *Sindermann* to give content to the notion of "mutually explicit understandings" was the labor law principle that the tradition and history of an industry or plant may add substance to collective-bargaining agreements. See 408 U. S., at 602. Just last Term, however, we rejected an argument that a sort of "industrial common law" could give rise to a liberty interest in the prisoner parole setting. The prisoners in *Connecticut Board of Pardons* v. *Dumschat*, 452 U. S. 458 (1981),[2] relying upon the

---

[2] JUSTICE STEVENS' dissenting opinion appears to follow from his dissenting view in *Greenholtz* v. *Nebraska Penal Inmates*, 442 U. S. 1, 22 (1979) (MARSHALL, J., joined by BRENNAN and STEVENS, JJ., dissenting in part), and *Connecticut Board of Pardons* v. *Dumschat*, 452 U. S., at 468 (STEVENS, J., dissenting). It is understandable that the distinction between *Morrissey* v. *Brewer*, 408 U. S. 471 (1972), which involved return to custody after parole release, and *Greenholtz* v. *Nebraska Penal Inmates*, *supra*, and *Connecticut Board of Pardons* v. *Dumschat*, *supra*, which involved prerelease expectations of parole or probation, would be thought

frequency with which the Connecticut Board of Pardons had in the past commuted and paroled life sentences, argued that the consistency of the Board's actions "'ha[d] created an unwritten *common law* of sentence commutation and parole acceleration,'" and had given rise to "'an *unspoken understanding* between the State Board [of Pardons] and inmates.'" *Id.*, at 465 (emphasis added) (quoting Brief for Respondents, O. T. 1980, No. 79–1997, pp. 17–18). We responded:

> "No matter how frequently a particular form of clemency has been granted, the statistical probabilities standing alone generate no constitutional protections; a contrary conclusion would trivialize the Constitution. The ground for a constitutional claim, if any, must be found in statutes or other rules defining the obligations of the authority charged with exercising clemency." 452 U. S., at 465.

Thus, this Court has recognized that the "mutually explicit understandings" of *Sindermann* have a far more useful place in determining protected property interests than in determining those liberty interests protected by the Due Process Clause of the Fourteenth Amendment.

As the majority opinion in the Court of Appeals for the Sixth Circuit observed: "Parole for Ohio prisoners lies wholly within the discretion of the OAPA. The statutes which provide for parole do not create a protected liberty interest for due process purposes." 641 F. 2d, at 414. In dissent, Judge Phillips explained:

> "In *State ex rel. Newman* v. *Lowery*, 157 Ohio St. 463, 464, 105 N. E. 2d 643 (1952), *cert. denied*, 344 U. S. 881 . . . (1952), the Supreme Court of Ohio said: 'The ques-

---

"dubious" by one who dissented in the two latter cases. Nonetheless, that view was expressed in dissents from the Court's opinions in those cases and cannot be regarded as controlling here.

tion of parole of prisoners being in the discretion of the Pardon and Parole Commission, that commission had authority to rescind its order of March 9, 1950, granting a parole effective on or after a future date.'" *Id.*, at 418.

Notwithstanding its conclusion that the granting of parole was a purely discretionary matter, the majority of the Court of Appeals in this case concluded that, once the recommendation for "shock parole" had been made, respondent was entitled to a hearing for the purpose of explaining his false statements and representations because the initial recommendation for "shock parole" gave rise to a "mutually explicit understanding." As we have previously stated, however, we deal here not with "property" interests but with "liberty" interests protected by the Fourteenth Amendment. We think that the reasoning of *Greenholtz* v. *Nebraska Penal Inmates*, 442 U. S. 1 (1979), *Dumschat, supra*, and the Court of Appeals' own concession that Ohio law creates no protected "liberty" interest, require reversal of the holding of the Court of Appeals that respondent was entitled to a hearing prior to denial of his parole in June.[3]

---

[3] Petitioners contend that this case is moot under *Weinstein* v. *Bradford*, 423 U. S. 147 (1975), because respondent has now been paroled. We disagree. Although it is true that respondent was released from prison in 1980, the release was conditioned upon respondent's compliance with terms that significantly restrict his freedom. For example, respondent must receive written permission before changing his residence, changing his job, or traveling out of state, must report to local law enforcement authorities at any out-of-state destination to which he travels, must not maintain a checking account, must report monthly to his parole officer, and may be imprisoned upon violation of the conditions of his parole. Affidavit in Support of Respondent's Motion to Proceed *In Forma Pauperis*. In *Weinstein*, by contrast, we noted that "respondent was temporarily paroled on December 18, 1974, and that this status ripened into a complete release from supervision on March 25, 1975. *From that date forward* it [was] plain that respondent [could] have no interest whatever in the procedures followed by petitioners in granting parole." 423 U. S., at 148 (emphasis added). Similarly, in *Jones* v. *Cunningham*, 371 U. S. 236 (1963),

The petition for certiorari is granted, the respondent's motion to proceed *in forma pauperis* is granted, and the judgment of the Court of Appeals for the Sixth Circuit is

*Reversed.*

JUSTICE BLACKMUN, concurring in the result.

I agree with the Court that the judgment of the Court of Appeals is to be reversed, but I am troubled by the rationale of the Court's *per curiam* opinion, and therefore I do not join it.

I would rest the reversal on the ground stated by Judge Phillips in his dissent from the judgment of the Court of Appeals, that is, on the fact that, under Ohio law, state parole authorities have the clear right to rescind a parole order be-

---

where a state prisoner received conditional parole virtually identical to respondent's parole in this case, we held that the prisoner was "in custody" for purposes of federal habeas and that the Court of Appeals had erred in dismissing the appeal as moot. *Id.*, at 241–243.

The conditions of respondent's parole will last for a period of two years; thereafter he will be free from OAPA's supervision. Had OAPA not rescinded respondent's parole in 1974 it is likely that he would no longer be subject to parole restrictions on his freedom. Therefore, were we to affirm the lower court's conclusion that OAPA should not have rescinded respondent's parole without a hearing, we could remand the case with instructions that the District Court determine whether a hearing would have resulted in respondent's release in 1974. If so, the flexible nature of habeas relief would permit the District Court to order that respondent be released from the conditions under which he is now living. Indeed, in his response to the petition for certiorari, respondent affirmatively states that if the lower court's decision is affirmed he will "immediately seek release from parole." Brief in Opposition 7.

In *Vitek* v. *Jones*, 436 U. S. 407 (1978), and *Scott* v. *Kentucky Parole Board*, 429 U. S. 60 (1976), the cases cited by the dissent, we remanded so that the Courts of Appeals might consider mootness before we decided the question. In this case the Court of Appeals did consider mootness and, as the above discussion indicates, correctly concluded that a live controversy remains.

fore it becomes effective. 641 F. 2d 411, 417–418. It therefore seems to me that the Court of Appeals erred in holding that there was a mutual understanding here. Respondent's expectation of release was no more than a unilateral one and no due process rights attached. I also could hold that no mutual expectation existed under the circumstances inasmuch as the Parole Board's order was based on respondent's untruths; respondent could not reasonably believe that there was a legitimate mutual understanding that he would be released.

That, I feel, is as far as this Court needs to go. I see no reason to go further and to suggest, as the Court does, that a mutual understanding may give rise to a property interest, but not to a liberty interest. That distinction may be an appropriate one, but I am not yet prepared to say so, and I certainly am not prepared to say so on a summary reversal. *Connecticut Board of Pardons* v. *Dumschat*, 452 U. S. 458 (1981), does not stand for so broad a proposition, and *Morrissey* v. *Brewer*, 408 U. S. 471, 482 (1972), suggests for me that a protected liberty interest may indeed be based on a mutual understanding.

JUSTICE STEVENS, with whom JUSTICE BRENNAN and JUSTICE MARSHALL join, dissenting.

Because the facts of this case are so unusual, it is surprising that the Court considers it appropriate to grant certiorari and address the merits. It is even more surprising that the Court has decided the mootness question by adopting the reasoning that persuaded JUSTICE BRENNAN, JUSTICE POWELL, and me to dissent in *Scott* v. *Kentucky Parole Board*, 429 U. S. 60; see also *Vitek* v. *Jones*, 436 U. S. 407, 410 (STEVENS, J., dissenting). See *ante*, at 21–22, n. 3. Nevertheless, I am unable to join the Court's disposition on the merits.

The Court has fashioned a constitutional distinction between the decision to revoke parole and the decision to grant or to deny parole. Arbitrary revocation is prohibited by

*Morrissey* v. *Brewer*, 408 U. S. 471, whereas arbitrary denial is permitted by *Greenholtz* v. *Nebraska Penal Inmates*, 442 U. S. 1, 9–11.[1] Even if one accepts the validity of that dubious distinction,[2] I believe the Court misapplies it in this case.

In the Court's view, the grant of parole creates a constitutionally protected interest in liberty that previously did not exist. Under that view, a profound change in the status of an individual occurs when he is paroled; he has greater legal rights after parole than before. The question is what event triggers this change in legal status, the act of walking through the exit gates or the State's formal decision, conveyed to the prisoner, to grant him his conditional freedom.

For the ordinary litigant, the entry of judgment by the decisionmaker—not the execution of that judgment by the sheriff—determines his legal rights. In my opinion, the interests in orderly decisionmaking that are protected by the Due Process Clause of the Fourteenth Amendment dictate a similar answer in the context of this case. As the Court has pointed out:

> "The parolee is not the only one who has a stake in his conditional liberty. Society has a stake in whatever may be the chance of restoring him to normal and useful life within the law. Society thus has an interest in not having parole revoked because of erroneous information or because of an erroneous evaluation of the need to revoke parole, given the breach of parole conditions. And society has a further interest in treating the parolee with basic fairness: fair treatment in parole revocations will

---

[1] Cf. *Connecticut Board of Pardons* v. *Dumschat*, 452 U. S. 458 (arbitrary denial of an application for commutation of a life sentence is permissible).

[2] See *Greenholtz* v. *Nebraska Penal Inmates*, 442 U. S., at 19–20 (POWELL, J., concurring in part and dissenting in part); *id.*, at 25–29 (MARSHALL, J., dissenting in part). See also *Connecticut Board of Pardons* v. *Dumschat*, *supra*, at 470 (STEVENS, J., dissenting).

enhance the chance of rehabilitation by avoiding reactions to arbitrariness." *Morrissey* v. *Brewer, supra,* at 484 (citation and footnote omitted).

It seems quite clear to me that precisely those interests are implicated by this case.

When the Ohio Adult Parole Authority revoked its decision to grant respondent parole, it acted on the basis of *ex parte* information which respondent had no opportunity to deny or to explain. Even if that information was entirely accurate in this case, and even if it was sufficiently important to justify the changed decision, the effect of the Court's holding today is to allow such decisions to stand even if wrong and wholly arbitrary. I am persuaded that such a holding is erroneous.[3]

---

[3] It is a federal constitutional question whether, under all the circumstances, including the existence of rights conferred by state statutes and other rules, an individual has such a legitimate claim of entitlement to freedom that due process protections attach. In its answer to that federal question, the Court of Appeals recognized that "[p]arole for Ohio prisoners lies wholly within the discretion of the OAPA. The statutes which provide for parole do not create a protected liberty interest for due process purposes." 641 F. 2d 411, 414 (CA6 1981). But the Court of Appeals' holding was based on circumstances other than the state statutes and other rules:

"We do not reach this conclusion on the basis of cases from jurisdictions which have rules or guidelines that establish entitlement to parole or permit rescission under narrowly defined circumstances. There is no evidence that Ohio has such rules or guidelines. Nor do we base our decision on the evidence that less than one percent of Ohio's parole grants are rescinded. Cf. *Dumschat* v. *Board of Pardons,* 618 F. 2d 216 (2d Cir.), *cert. granted,* [449 U. S. 898] (1980). This evidence related to paroles generally and there was no proof directed specifically to shock parole, the comparatively new Ohio method of release involved in the present case. Rather, the decision is based on the facts of this case which lead ineluctably to the conclusion that acts of the OAPA created a protected liberty interest in Van Curen." *Id.,* at 416–417 (citations omitted).

Even if the Court correctly states that "the 'mutually explicit understandings' of *Sindermann* have a far more useful place in determining protected property interests than in determining those liberty interests pro-

If the Court had allowed the parties to argue the merits of the issue—instead of acting summarily on the basis of an incomplete presentation—the error might have been avoided. In all events, I respectfully dissent.

---

tected by the Due Process Clause of the Fourteenth Amendment," *ante*, at 20, the question remains whether the act of the State in notifying the respondent that he had been granted parole as of a specific date created such a legitimate expectation of freedom as to trigger due process protections. The Court does not address that question, relying instead on the "concession [of the Court of Appeals] that Ohio law creates no protected 'liberty' interest." *Ante*, at 21. But even this Court's narrowest decisions do not limit the due process analysis to an examination of written state laws; nor do they exclude consideration of the decisions and acts of the State directed at a particular individual.