**INMATES OF ORIENT CORRECTIONAL INSTITUTE, Plaintiffs–Appellants,**

v.

**OHIO STATE ADULT PAROLE AUTHORITY, et al.,
Defendants–Appellees.**

No. 90–3543.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 12, 1991.

Decided March 26, 1991.

Lawrence J. Greger (argued), Marlena L. Pankowski, Greger & Ovington, Dayton, Ohio, for plaintiffs-appellants.

Allen P. Adler (argued), and Frederick C. Schoch, Asst. Attys. Gen., Steven W. Ritz, Office of the Atty. Gen. of Ohio, Columbus, Ohio, for defendants-appellees.

Before NELSON and SUHRHEINRICH, Circuit Judges, and HACKETT, District Judge.*

DAVID A. NELSON, Circuit Judge.

This is an appeal from the denial of a preliminary injunction in a federal civil rights action brought under 42 U.S.C. § 1983 by a group of parole-eligible Ohio prison inmates.

Each of the plaintiff inmates received a hearing before a board of the Ohio Adult Parole Authority. In each instance the hearing resulted in a decision to grant parole "on" or at some indeterminate time "after" a specified date (commonly called the "on or after date"), subject to approval of an acceptable out-of-prison placement plan by the Authority's Parole Supervision Section.

Primarily because of a shortage of space in the limited number of halfway houses that accept sex offenders, it proved difficult to find acceptable placements for the plaintiffs in this case. Each of the plaintiffs who testified at the injunction hearing appears to fall in the "hard to place" category,[1] and each of them testified either that his on or after date had been rescinded or that rescission was threatened.

Rescission of an on or after date is not preceded by a formal hearing, under Ohio's practice, although it is the policy of the parole board to hold a hearing soon after

---

* The Honorable Barbara K. Hackett, United States District Judge for the Eastern District of Michigan, sitting by designation.

1. Of the five inmates who testified, the first had been convicted of aggravated assault and rape, the second had been convicted on one count of rape and two of sexual battery, the third had been convicted of attempted rape, the fourth (the only one never found guilty of a sex crime) had been convicted of aggravated robbery and kidnapping, and the fifth had been convicted of corruption of a minor. The chief of Ohio's Adult Parole Authority testified that "many kinds of sex offenders are extremely recidivistic," and he answered "yes" when asked if "the hard-to-place issue arises most often in the placement of sex offender inmates."

rescission has occurred. The hearing gives the inmate an opportunity to present documents and to discuss his placement problem directly with the board; the inmate is not entitled to call witnesses, however, or to be represented by counsel.

Alleging that rescission of on or after dates without prior notice and opportunity for an evidentiary hearing violates due process rights guaranteed by the federal constitution, the plaintiffs sought an interlocutory injunction to bar rescission pending determination of the merits of their lawsuit. The district court declined to grant such an injunction, holding that the plaintiffs had failed to sustain their "initial burden" (see *N.A.A.C.P. v. City of Mansfield*, 866 F.2d 162, 167 (6th Cir.1989)) of showing a substantial likelihood of success on the merits.

For reasons well stated in the comprehensive opinion filed by the district court, the court concluded, among other things, that Ohio law gives a prison inmate no constitutionally protected liberty interest in being released at a time related to his on or after date. We agree. We shall affirm the denial of the injunction on this ground, without reaching the question whether, as the district court also concluded, the plaintiffs had no likelihood of succeeding in a § 1983 action because their sole federal remedy lies in habeas corpus.

## I

The Due Process Clause of the Fourteenth Amendment, which imposes the same restraints on the states that the corresponding clause of the Fifth Amendment imposes on the national government, prohibits "any State [from] depriv[ing] any person of life, liberty, or property, without due process of law...." No right to due process arises, under this language, except where a state undertakes to deprive a person of one or more of the three interests specified: life, liberty, or property. It is "liberty," of course, with which we are concerned in the case at bar.

■ Although incarceration itself represents a quintessential deprivation of liberty, lawful incarceration does not extinguish all of a prisoner's constitutionally protected liberty. Prison inmates retain what the Supreme Court has characterized as "a residuum of liberty," *Olim v. Wakinekona*, 461 U.S. 238, 245, 103 S.Ct. 1741, 1745, 75 L.Ed.2d 813 (1983) (citing *Wolff v. McDonnell*, 418 U.S. 539, 555–56, 94 S.Ct. 2963, 2974–75, 41 L.Ed.2d 935 (1974)), despite the fact that inmates are not at liberty in the normal sense. If state law entitles an inmate to release on parole, moreover, that entitlement is a liberty interest which is not to be taken away without due process. See *Greenholtz v. Inmates of the Nebraska Penal & Correctional Complex*, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979), where the Supreme Court so held in the context of a statute providing that the Nebraska parole board "shall" release parole-eligible inmates unless one of several factors specified in the statute should be found to exist.

The Supreme Court has made it clear that a mere unilateral hope or expectation of release on parole is not enough to constitute a protected liberty interest; the prisoner "must, instead, have a legitimate claim of *entitlement* to it." *Id.* at 7, 99 S.Ct. at 2104 (quoting *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972)) (emphasis supplied). And only state law can create this "legitimate claim of entitlement;" the federal constitution protects such claims, but does not create them. "There is no constitutional or inherent right of a convicted person to be conditionally released [*i.e.*, released on parole] before the expiration of a valid sentence." *Greenholtz*, 442 U.S. at 7, 99 S.Ct. at 2104.

## II

■ The law of Ohio gives a convicted person no legitimate claim of "entitlement" to parole before the expiration of a valid sentence of imprisonment. This remains true even after the Ohio Adult Parole Authority has approved the prisoner's release on parole on or after a specified date. Thus in *Jago v. Van Curen*, 454 U.S. 14, 102 S.Ct. 31, 70 L.Ed.2d 13 (1981), a post-

*Greenholtz* case, the Supreme Court of the United States squarely held that the Ohio Adult Parole Authority's rescission of a decision to grant parole on or after a specified date did not constitute a deprivation of "liberty" within the meaning of that term as used in the Due Process Clause.

There has been no relevant change in Ohio's law since the decision in *Jago.* That case, unlike this one, happened to involve "shock" parole, but nothing turns on the distinction. This court has recognized ever since *Greenholtz* that Ohio Rev.Code § 2967.03—the statute under which the plaintiffs in the instant case hope to be released—"is purely discretionary." *Wagner v. Gilligan,* 609 F.2d 866, 867 (6th Cir.1979).

The statute says that the Ohio Adult Parole Authority *"may ... grant a parole* to any prisoner, if in its judgment there is reasonable ground to believe that, if ... the prisoner is paroled, such action would further the interests of justice and be consistent with the welfare and security of society." Ohio Rev.Code § 2967.03 (emphasis supplied). The grant of discretion contained in this statute is, obviously, very broad indeed. The operative verb is permissive, not mandatory; to say that the Adult Parole Authority "may grant" parole is not to say that it must grant parole.

There are regulations, as we shall see, that prescribe certain limitations on the affirmative power to grant parole, but those limitations in no way detract from the fact that under Ohio's system, as in the situation considered by the Supreme Court in *Olim v. Wakinekona,* 461 U.S. 238, 249, 103 S.Ct. 1741, 1747, 75 L.Ed.2d 813 (1983), the decisionmaker "can *deny* the requested relief for any constitutionally permissible reason or for no reason at all." *Id.* (quoting *Connecticut Bd. of Pardons v. Dumschat,* 452 U.S. 458, 467, 101 S.Ct. 2460, 2466, 69 L.Ed.2d 158 (1981) (Brennan, J., concurring)) (emphasis supplied). Where the power of denial is this broad, "the State has not created a constitutionally protected liberty interest." *Olim,* 461 U.S. at 249, 103 S.Ct. at 1747.

The Sixth Circuit decision that was before the Supreme Court for review in *Jago*—a decision reported at 641 F.2d 411 (1981)—acknowledged, as the Supreme Court noted (454 U.S. at 16, 102 S.Ct. at 33), that "[p]arole for Ohio prisoners lies wholly within the discretion of the [Ohio Adult Parole Authority]," and that "[t]he statutes which provide for parole do not create a protected liberty interest for due process purposes." 641 F.2d at 414. Although a majority of the Sixth Circuit panel nonetheless concluded that a constitutionally protected liberty interest could arise from "mutually explicit understandings," *id.* at 416, this conclusion was rejected by the Supreme Court: "We hold that the Court of Appeals erred in finding a constitutionally protected liberty interest by reliance upon ... 'mutually explicit understandings'...." *Jago,* 454 U.S. at 17, 102 S.Ct. at 34.

We do not doubt that in the case at bar it was understood by all concerned that the plaintiffs would be released around the time of their on or after dates, assuming out-of-prison placements acceptable to the Parole Supervision Section could be found. The record does not disclose what understanding, if any, the parole authorities may have had as to the likelihood that acceptable placements could be found. The plaintiffs themselves, however, may well have understood that they were likely to be released—and we can appreciate their disappointment that the hopes and expectations attendant upon the setting of on or after dates should have been frustrated. But as the Supreme Court explicitly told us in *Jago,* it would be wrong to find that understandings based on the setting of on or after dates can create any constitutionally protected liberty interest.

Although the power to deny parole is purely discretionary as far as Ohio's statutes are concerned, the state's administrative regulations must also be considered. If Ohio's regulations created an explicit presumption of entitlement to release on parole—as Tennessee's regulations formerly did, see *Mayes v. Trammell,* 751 F.2d 175, 178 (6th Cir.1984)—or if the Ohio regulations otherwise used "'mandatory lan-

guage' in connection with 'specific substantive predicates' " for release on parole, see *Beard v. Livesay,* 798 F.2d 874, 877 (6th Cir.1986) (quoting *Hewitt v. Helms,* 459 U.S. 460, 472, 103 S.Ct. 864, 871, 74 L.Ed.2d 675 (1983)), the regulations alone could create a protected liberty interest. But absent "specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow," the regulations could not create a liberty interest. *Kentucky Dept. of Corrections v. Thompson,* 490 U.S. 454, 463, 109 S.Ct. 1904, 1910, 104 L.Ed.2d 506 (1989).

"[W]ithin the context of the instant case," as the district court said in the decision now before us for review, *"Thompson* would require language in the Ohio scheme expressly mandating that once an inmate is granted parole and given an 'on or after' date, he *must* be released absent a showing of specific factors (or, alternatively, that an inmate's 'on or after' parole status *will not* be rescinded absent the finding of such factors). There is no such language in the Ohio parole scheme." (Emphasis in original.)

We can find no such language in the Ohio scheme either. Ohio Admin.Code § 5120:1-1-07 (a section captioned "Procedure for release on parole, furlough, and shock parole") provides that "[a]n inmate *may* be released on or about the date of his eligibility for release" unless one or more circumstances specified in the regulation is found to exist. (Emphasis supplied.) "May," to repeat, is permissive, not mandatory; a regulation saying that an inmate "may" be released in the absence of specified factors simply does not say that the inmate *must* be released if none of the specified factors is present.

It is true, as the plaintiffs point out, that the chapter of the Ohio Administrative Code containing § 5120:1-1-07 also contains a "Statement of policy" that concludes with this language:

"Decision making involves the exercise of discretion. Unlimited discretion is to be eliminated. Necessary discretion is to be structured. Whenever feasible, persons directly affected by the decision making process shall be given notice and an opportunity to be heard prior to the decision becoming final. Fairness and equity shall be the standards by which inmates, releasees, staff and the public are treated." Ohio Admin.Code § 5120:1-1-02(G).

We are not persuaded that the substantive provisions of Ohio Admin.Code § 5120:1-1-07 should be read as meaning something other than what they say simply because a policy section of the administrative code says that "unlimited" discretion is to be eliminated and necessary discretion is to be "structured." Discretion to grant parole certainly has been limited by § 5120:1-1-07, even though discretion to deny parole is limited only by constitutional considerations (the Fourteenth Amendment's prohibition against denying any person the equal protection of the laws, *e.g.*)—and the parole board's necessary discretion is certainly "structured" in the sense that its exercise involves the hearing process mentioned at the outset of this opinion.

■ The district court concluded that rescission hearings of the sort described in the testimony of the Chief of the Adult Parole Authority provided "an opportunity to be heard prior to the decision [on rescission] becoming final," as required by Ohio Admin.Code § 5120:1-1-02(G), because "inmates are given a hearing before the Parole Board prior to the journalization (in its minutes) of its decision to rescind." The testimony on which this conclusion was based is not a model of clarity, and we are not certain that the district court interpreted the testimony correctly. Even if journalization were to occur prior to the rescission hearing, however, it would make no difference from a constitutional standpoint. It is clear that "procedural requirements alone cannot establish a liberty interest," *Beard v. Livesay,* 798 F.2d 874, 877 (6th Cir.1986), and a violation of state regulations requiring a particular kind of hearing cannot violate the Due Process Clause absent some independent basis for finding a "liberty interest" that has been taken away. *Olim v. Wakinekona,* 461

U.S. 238, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983).

The last of the regulatory provisions on which the plaintiffs rely in support of their claim to a liberty interest is Ohio Admin. Code § 5120:1–1–02(D). That section reads as follows:

"The release procedures in these Administrative Regulations provide for orienting the inmate toward release, the preparation for the Parole Board of all data pertinent to the case, a release hearing based upon careful study of such data under procedures which insure fairness and rational decision making, formulation and investigation of a satisfactory release plan, release under professional supervision, and return to confinement for those who violate the terms and conditions of their release and are unwilling or unable to readjust satisfactorily under supervision."

Nothing in this language suggests to us that efforts to formulate a satisfactory release plan must inevitably be successful, or that the investigation of whatever release plan might be proposed by the inmate must inevitably lead to a finding that the proposed plan is "satisfactory."

■ The plaintiffs stress the fact that in "orienting" them toward release, the state transferred them to a minimum security prison, Pickaway Correctional Institute, where they were assigned to a pre-release dormitory. (One of the plaintiffs testified that he had less freedom there than at the "closed security" institution from which he had been transferred, but other witnesses, including the chief of the parole authority, testified that conditions were less restrictive at the pre-release dormitory than at the institutions from which the plaintiffs had come. The district court, not surprisingly, accepted the latter testimony as true.) Transfer to a pre-release center may buttress an inmate's subjective expectation that he will be released on parole, but such a transfer obviously cannot create a legitimate claim of entitlement to release. Neither can the transfer create any liberty interest in remaining at the pre-release center following rescission of the on or after date. See *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976); *Montanye v. Haymes,* 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976); *Olim v. Wakinekona,* 461 U.S. 238, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983).

### III

It became clear in the oral argument of this appeal that the plaintiffs' fundamental complaint is not, in fact, a complaint with the "process" followed by the state; the plaintiffs' real complaint is with the state's failure to provide enough halfway houses (or similar facilities) to insure a satisfactory out-of-prison placement for every inmate the parole board would be willing to release if a satisfactory placement could be found for him. Plaintiffs' counsel even went so far as to suggest that a federal court could *require* the state to build and staff more halfway houses, if the court should decide that more halfway houses would be desirable.

The United States Constitution vests no such power in the federal courts, of course. More halfway houses can be provided directly by the people, through voluntary action, or by the people's elected representatives, through the appropriation of public funds, but they cannot be provided by judicial fiat. Poets, to borrow Shelley's phrase, may be "the unacknowledged legislators of the world," but federal judges are not.

■ Although the Eighth and Fourteenth Amendments empower the judicial branch of the federal government to order a stop to infliction of cruel and unusual punishments, there is no claim of any such punishments having been inflicted here. And even if there were such a claim, there would still be nothing in the Constitution authorizing us to require the State of Ohio to maintain the kind of facilities for parole that the plaintiffs would like to see. We have no power, indeed, to require the State of Ohio to maintain any parole system at all. See *Greenholtz,* 442 U.S. at 7, 99 S.Ct. at 2103 ("A state may ... establish a parole system, but it has no duty to do so").

As a matter of legislative policy, an expanded system of parole may well have much to commend it. None of us can be comfortable with the fact that our country imprisons a higher percentage of its citizens—and keeps them in prison longer—than virtually any other civilized nation. The district court, in dicta that formed a sort of coda to its opinion, spoke to this general subject with some passion:

"If the state of Ohio and its citizens do not soon realize that the problems of crime can only be dealt with by dealing with the causes of same, the poverty, the ignorance, the drug addiction, the alcoholism, the educational and psychological deprivation and the like, our crime problem cannot and will not decrease. Indeed, unless all of us realize that the problems of crime cannot be solved simply by building more and more prisons and by locking up people therein and literally 'throwing the key away,' none of us should be surprised that inmates from our prison system, once released, will once again violate the criminal laws to an alarming degree."

The discussion that preceded this passage in the district court's opinion also provides food for thought—and may, for some people, tend to confirm the wisdom of the Founders in leaving legislative questions to the legislature. After noting that the plaintiffs have committed crimes that are particularly reprehensible, the district court said that because the plaintiffs "have served the minimum sentence prescribed by law ... [t]hey have paid their debt to society." That debt having been paid, the court went on to observe, it is both sad and paradoxical that "these prison inmates can find no safe harbor—no one to take them in, no halfway house facility willing to accept them and no facility in the outside world, in society, that can adequately treat those very conditions which caused them to offend against society in the first instance."

No compassionate person could disagree, surely, with the thought that the plight of these plaintiffs is a sad one. But so was the plight of their victims—the women they raped, the children they molested, the people they kidnapped. The plaintiffs' debt to their victims can be forgiven, no doubt, but one wonders whether such a debt can ever truly be "paid."

And it is not solely for punishment, of course, that society imprisons people who commit crimes of violence; society imprisons them to protect itself against further violence at their hands. If, as the district court suggested, long prison terms mean that "inmates from our prison system, once released, will once again violate the criminal laws to an alarming degree," at least it would seem indisputable that society will have little to fear from them for as long as they remain in prison.

Halfway houses that choose not to accept people with records like the plaintiffs' are not necessarily acting irrationally. There is an obvious risk that, given the opportunity, a man who has molested a child once will do it again—and it is a "fact," according to the United States Supreme Court, "that anticipations and hopes for rehabilitation programs have fallen far short of expectations of a generation ago...." *Greenholtz,* 442 U.S. at 13, 99 S.Ct. at 2107. Society has a right of self-protection, and the degree of risk that society is willing to tolerate is ultimately a question for society itself. We judges may not always be happy with society's choices, but unless the Constitution itself be violated, we must accept them.

There is probably room for debate, finally, over the extent to which the State of Ohio and its citizens are capable of identifying, much less correcting, the "conditions" that "caused" the plaintiffs to commit the crimes for which they were imprisoned. It is apparent that crime often flourishes, in our society, where there is poverty and ignorance. Most people who suffer from poverty and ignorance do not commit sex crimes, however—and some people who do commit such crimes are neither poor nor ignorant. The dividing line between good and evil, as Solzhenitsyn reminds us in one of his novels, cuts through every human heart. One would like to believe that no human being would ever act on an evil

impulse if we could somehow find a universal cure for poverty, ignorance, and the like, but it may not be true—and such a cure remains elusive in any event. Ohio and its citizens are likely to find themselves struggling for a long time to come to terms with the types of policy questions to which the district court alluded.

For the reasons stated, the denial of the preliminary injunction sought by the plaintiffs is AFFIRMED.