ROBERT MAXWELL KELCH, Appellant, *v.* DIRECTOR, NEVADA DEPARTMENT OF PRISONS, GEORGE SUMNER, Respondent.

No. 21078

December 6, 1991 822 P.2d 1094

*Stewart L. Bell,* Las Vegas, for Appellant.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Robert J. Gower,* Deputy Attorney General, *John E. Simmons,* Deputy Attorney General, Las Vegas, for Respondent.

828

## OPINION

By the Court, SPRINGER, J.:

In this lawsuit, appellant Robert Kelch (Kelch) contests the revocation of a commutation that had previously been granted to him by the Nevada Board of Pardons Commissioners (the "Board" or "Pardons Board"). In 1985, Kelch pleaded guilty to a charge of second degree murder and was sentenced to twenty years in the Nevada State Prison. After Kelch had served two years of this sentence, he applied for a pardon/commutation from the Pardons Board. On May 12, 1987, the Board met and considered Kelch's petition. At this hearing, Kelch and his attorney testified before the Board; in addition, the Board received a letter from Judge Beko (the sentencing judge) stating that he neither supported nor objected to Kelch's petition. The district attorney from Nye County (the prosecuting attorney) had notice of the meeting, but did not appear or file an objection. Following the hearing, the Board issued an order commuting Kelch's sentence to five years.

Upon learning of the commutation, the Nye County District Attorney filed a motion for reconsideration. In response to the district attorney's motion, the Pardons Board placed the matter on its November 23, 1987, agenda. At this hearing, Kelch and his attorney presented testimony in support of the Board's original decision. Conversely, the Nye County District Attorney presented testimony in favor of rescinding the commutation and reinstating the original sentence. Following the hearing, the

Board voted 6-1 to rescind the commutation and reinstate the original sentence.

Kelch then filed for a writ of habeas corpus in the United States District Court for the District of Nevada. On December 13, 1988, the federal court denied this petition, holding that Kelch had failed to exhaust his remedies in the Nevada courts. Thus, on March 9, 1989, Kelch filed an application for writ of habeas corpus in this court. This court denied the writ and instructed Kelch that he could not bring the matter directly before this court, but rather must file for a writ in the district court.

On March 31, 1989, Kelch filed for a writ of habeas corpus from the Fifth Judicial District Court. The parties then stipulated to have the matter heard in the Eighth Judicial District Court. On May 22, 1989, the matter came before Judge Thompson, and after listening to oral argument, he denied the writ. Kelch now appeals.

Kelch's sole contention in this appeal is that the Board, in rescinding its original commutation order, violated his due process rights. To address this argument, it is necessary to review several principles of due process jurisprudence. To begin, the due process clause only applies where the claimant has been deprived (or is in jeopardy of being deprived) of some type of liberty interest. Morrissey v. Brewer, 408 U.S. 471, 481 (1972).[1] Thus, if a liberty interest is not at stake, the claimant cannot assert the protections of due process. *Id.* If, however, the government is attempting to infringe on a protected liberty interest, then it (the government) may do so only if it follows the procedures mandated by the due process clause. *Id.* Consequently, in analyzing Kelch's due process claim, two questions must be asked: (1) Did the Board deprive Kelch of a protected liberty interest? (2) If so, did Kelch receive all the process that he was due? We will now address each of these issues in turn.

The initial question that must be addressed is whether the Board's action deprived Kelch of a protected liberty interest. In Morrissey v. Brewer, 408 U.S. at 481, the Court stated that "whether any procedural protections are due depends on the extent to which an individual will be condemned to suffer grievous loss." In *Morrissey,* the Court observed that the liberty of a

---

[1]Of course, the requirements of due process also apply where the government is attempting to deprive a person of a life interest or a property interest. Because Kelch's interest in his commutation appears to be, if anything, a liberty interest, however, we have not included a discussion of property or life interests in our analysis.

parolee "includes many of the core values of unqualified liberty and its termination inflicts a grievous loss on the parolee and often on others." *Id.* at 482. Accordingly, the Court held that before parole could be revoked, the parolee must receive some "orderly process, however informal." *Id.*

The procedural protections of due process are not invoked, however, *every* time an individual suffers a "grievous loss." In Jago v. Van Curen, 454 U.S. 14, 17 (1981), the parole board informed the prisoner that he was to be granted parole, but then rescinded its decision prior to release of the prisoner. The Court conceded that this action by the parole board had caused a "grievous loss" in the mind of the prisoner. Nevertheless, the Court held that no protected liberty interest had been created, since the prisoner had never received the benefit promised, *i.e.*, the prisoner was never actually paroled. *Id.* Because no liberty interest had been created, the Court reasoned, the parole board was not required to conform to the dictates of due process in reversing its original decision. *Id.*

In Ellard v. Alabama Board of Pardons and Paroles, 824 F.2d 937 (11th Cir. 1987), *cert. denied*, 485 U.S. 981 (1987), the court expanded on the principles discussed in *Jago.* In *Ellard,* the Alabama Parole Board granted parole to the prisoner; the prisoner was then released directly into the custody of the State of Georgia to serve a life sentence there. *Id.* at 940. Following a "burst of public outrage at the parole decision," however, the Alabama Parole Board revoked its original ruling and rescinded its grant of parole. *Id.* at 940-41. The question before the Eleventh Circuit was whether, by originally granting parole, the Alabama Board had given the prisoner a protected liberty interest.

The court in *Ellard* held that a such an interest had been created. In so holding, the court observed that: "The states, of course, may elect not to confer rights . . . that are not inherent in the Constitution. But once a state does choose to confer such a right, the prisoner's interest has 'real substance' and can be revoked only under the limitations imposed by the due process clause." *Id.* at 943. The court then distinguished *Jago,* by pointing out that there, the benefit conferred by the parole board, *i.e.*, parole, had never actually been received by the prisoner. *Id.* at 943 n.4. By contrast, in *Ellard,* the prisoner had *actually received* parole, though not outright release. *Id.* Because the benefit received by Ellard thus had "real substance," the court reasoned, it could be revoked only under the limitations imposed by due process.[2]

---

[2]The *Ellard* court then remanded the case to the district court in order to conduct factual findings as to whether Alabama had accorded the prisoner the process that he was due before his parole was rescinded. *Id.* at 949.

Applying these principles to the facts of this case, we conclude that the Pardons Board's original order created a protected liberty interest in favor of Kelch. Here, it is clear that Kelch *actually received* the benefit conferred by the Pardons Board. Following the May 12, 1987, hearing, the Board issued an "Order Commuting Sentence," which stated that "[i]t is hereby ordered that *effective this date* applicant's sentence be commuted from 20 years to five years of imprisonment . . . ." (Emphasis ours.) Thus, by virtue of this order, Kelch *received* his commutation on May 12, 1987, and his case is therefore distinguishable from *Jago,* where the prisoner did not receive parole, but was simply informed that he *would soon* receive parole. For this reason, Kelch obtained an interest with "real substance" at the time the Pardons Board issued its order, and the deprivation of this interest caused Kelch to suffer a "grievous loss." Accordingly, Kelch's commutation could be revoked only under the limitations imposed by the due process clause.

Having concluded that Kelch received a protected liberty interest from the Pardons Board, we now turn to the question of whether the Board deprived him of that interest in a manner consistent with the due process clause. The United States Supreme Court has often dealt with the issue of what procedures are required by due process, and has noted that "[d]ue process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer,* 408 U.S. at 481. In addition, the Court has explained that the most fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner. Matthews v. Eldridge, 424 U.S. 319, 333 (1976).

In McLaughlin v. Bronson, 537 A.2d 1004 (Conn. 1988), the court discussed the requirements of due process in a situation quite similar to this one. In *McLaughlin,* the Connecticut Board of Pardons commuted the sentence of the prisoner (McLaughlin) from twenty years to time served. *Id.* at 1005. Following the hearing, however, the Board learned that McLaughlin's wife had made several material misrepresentations during her testimony before the board. *Id.* For this reason, the board reheard the matter and rescinded the commutation. *Id.* at 1005-6.

The prisoner then brought an action for habeas corpus, and alleged, among other things, that the Board of Pardons had violated his due process rights. The Connecticut Supreme Court disagreed. The court began its analysis by assuming that the prisoner had received a protected liberty interest when he obtained the commutation. *Id.* at 1008 n.3. The court then held that because the Board of Pardons had afforded McLaughlin the following protections: "notice, hearing, representation by coun-

sel, the right to confront and cross-examine witnesses, a neutral and detached hearing body and a written statement articulating the reasons for revocation,'' McLaughlin had received all the process that he was due under the fourteenth amendment. *Id.*

In the instant case it is clear that the Board accorded Kelch due process when it revoked his commutation. Kelch was given notice and an opportunity to appear at the revocation hearing. In addition, Kelch was represented by counsel at this hearing, and was given the opportunity to present evidence, witnesses, and documents on his own behalf. Further, it appears from the record that Kelch was able to contradict and confront those witnesses that testified against him at the November hearing. Moreover, even though the Board's order did not appear in the form of a written decision, many of the Board members stated, on the record, their reasons for revoking the original commutation. Because the Board gave Kelch all these procedural protections before revoking his commutation, we hold that Kelch was given the opportunity to be heard at a meaningful time and in a meaningful manner, and thus received due process.

Accordingly, the order of the district court is affirmed.

MOWBRAY, C. J., concurs.

STEFFEN, J., concurring:

I concur in the majority opinion but feel compelled to respond to the gratuitous remarks of the dissenting justices regarding the participation of the members of this court on the Board of Pardons (Board).

Nevada is a unique state. As far as I have been able to ascertain, Nevada's mechanism for administering clemency is also unique among the states. During the 1863 Nevada Constitutional Convention, the proposed powers of pardon and reprieve were initially vested in the Governor. The available discussion on the proposal is limited and reads as follows:

> Mr. Brosnan said he though the section conferred altogether too unlimited and dangerous power upon the Governor. He would like to have the opinion of someone who was conversant with this matter.

> Mr. Johnson said the section conferred upon the Governor not only great power, but also great responsibility. He thought it would be better to divide both, and suggested that the pardoning power might be rested in the Governor, Chief Justice and Attorney General. In order to devise some proper arrangement, differing possibly, from the systems in vogue in the other States, he moved that the Committee recommend the reference of the section to a Special Committee. As to the

particular matter referred to by Mr. Brosnan, of the power of the Executive to impose restrictions and limitations, the object was to enable the Executive to require pardoned criminals to leave the State—by which means the commonwealth often got rid of dangerous characters.

A. Marsh, S. Clemens & A. Bowman, Reports of the 1863 Constitutional Convention of the Territory of Nevada 135 (W. Miller, E. Bushnell 1972).

Unfortunately, we apparently do not have additional history concerning the deliberations of the committee assigned to the task of formulating recommendations for the constitutional provision conferring the powers of pardon and reprieve. History reveals, however, that the initial proposal vesting all such power in the Governor was changed to include the Governor, the Justices of the Supreme Court and the Attorney General acting by majority rule, with the Governor necessarily voting with the majority. Thus, the current composition and decisional powers of the Board have existed as part of our original constitution since 1864 when Nevada was admitted to the Union.

There are current moves under way to amend Nevada's constitution in order to change its pristine clemency mechanism by removing the Justices of the Supreme Court from the Board. I have heard two reasons advanced in favor of the proposition, neither of which, in my opinion, has validity. The first reason may be treated summarily. It is argued that the members of this court are too busy to perform their functions as members of the Board. The Board meets twice yearly. The total time necessary to fully prepare for and conduct the hearings is three days. I suggest that the business of the Board is sufficiently important to warrant an allowance of time necessary to fulfill the purposes of the Board. Moreover, necessity suggests that an intermediate appellate court will become a reality in the not distant future, thus providing more time for the members of this court to perform their duties on the Board. In any event, the powers of pardon and commutation have been viewed with a high degree of concern from the time of Nevada's birth as a state. Criminal accountability with its associated penalties is achieved at substantial social cost. We should view with equal importance the prospect of granting relief from lawfully imposed sentences, given the potential cost to society of an undiscerning use of the Board's powers.

The dissenting justices address the second, and ostensibly more plausible reason for relieving the members of this court from service on the Board by stating that "[t]his case illustrates why Supreme Court Justices should not sit on the Board of Pardons. We grant early release with one hand and snatch it away with the other. A conflict of interest is inherent when this court is

asked to review its own decisions while sitting in another capacity." I disagree with every aspect of the quoted conclusions for the following reasons:

1. There is no conflict, inherent or otherwise, in having the members of this court sit on the Board. Although I will address the instant case separately, it is worth emphasizing that, as far as research reveals, the case before us is unique in the annals of the Board. It must also be emphasized that the Supreme Court is not a sentencing body. Despite the fact that under circumstances both historically and comparatively rare, the Court must fulfill its constitutional mandate to modify sentences that are constitutionally infirm, in no case does the court have any sort of "vested" interest in maintaining convictions and sentences determined and imposed by juries and other judges. The reference by the dissent to the members of this court granting relief with one hand (sitting as members of the Board) and snatching it away with the other (as justices sitting on appellate review) is in no sense supportive of the proposition that we do so in a position of conflict. This court routinely processes petitions for rehearing in which the court is invited to reconsider the propriety of its own rulings. I have yet to hear a justice contend that a conflict arises by virtue of the fact that we are faced with the prospect on rehearing of declaring ourselves in error in our initial dispositions. As Supreme Court Justices our sworn duty is to respect and comply with the law and conduct ourselves so as to promote public confidence in the integrity and impartiality of the judiciary. We are able to do so as members of the Board with even less potential "conflict" than we do as members of an appellate court often petitioned to reconsider the propriety of its own rulings. Usually, as Board members we simply determine whether the passage of time and circumstances developing after an applicant's original conviction and sentence warrant an exercise of the Board's powers of clemency.

2. The dissent focuses on the instant case specifically when it declares that "[a] conflict of interest is inherent when this court is asked to review its own decisions while sitting in another capacity." The assertion is seriously flawed. First, this court was not asked to review "its own decision," for we do not sit as a court when functioning as constitutional members of the Board. What we are asked to do as a court in this unique case, is to review the decision of the constitutionally comprised Board on which we sit as individual members. I must assume that if any members of this court, including the dissenting justices, viewed themselves in a position of conflict in undertaking such a review, they would have disqualified themselves as required by Canon 3 C of the Supreme Court Rules. Indeed, the mere fact that the dissenting justices

have concluded that the Board's action was without jurisdiction is cogent evidence that the process is unimpaired by some sort of misguided allegiance to Board action that would impact the capacity of this court to exercise an independent and honest judgment on the merits. Moreover, this court has previously validated the propriety of members of this court acting in one capacity concerning the same matter that ultimately comes before the same justices sitting in a different capacity as part of the reviewing court. Thus, in both Goldman v. Bryan, 104 Nev. 644, 764 P.2d 1296 (1988), and In re Petition to Recall Dunleavy, 104 Nev. 784, 769 P.2d 1271 (1988), members of this court who acted in an administrative capacity to reach or make decisions that later became directly implicated in litigation reviewed or otherwise acted upon by the same justices as part of this court, were not disqualified by any form of inherent conflict posed by acting in two different capacities concerning the matters that were litigated. To the contrary, we held that "[e]ven where the court's prior judicial and administrative actions may support an inference that the justices in question possess legal opinions at odds with appellant's views of the court's constitutional authority, that fact does not constitute a legally cognizable ground for disqualification." *Goldman,* 104 Nev. at 654, 764 P.2d at 1302. An honest, honorably motivated judge is equally able to adjudicate impartially whether rehearing his or her own prior rulings or the rulings or decisions reached in part by the same judge authoritatively acting in another capacity. Justices of this court are not infrequently required to do just that as part of their sworn duties of office.

Because supreme court justices are elected in Nevada, it would undoubtedly be of political advantage for justices to be able to avoid what may on occasion be viewed by the public as unwise or unpopular decisions on the part of the Board. I suggest, however, that members of this court should be willing to assume that risk in order to preserve a system that I submit has served the State of Nevada well for over one and a quarter centuries. Paraphrasing a platitudinous metaphor, the wheel, as yet unbroken, is hardly in need of replacement. And who knows, the new product may be inferior to the old.

YOUNG, J., with whom ROSE, J., agrees, dissenting:

Respectfully, I dissent. I conclude that the Nevada Board of Pardons Commissioners (Board) did not have jurisdiction to rescind the commutation of a sentence. Once the Board issued an order with an effective date, Kelch had a protected liberty interest in release and the Board lost jurisdiction to rescind the commutation.

The majority concedes that Kelch's protected liberty interest vested on the effective date of the order. Once a liberty interest vests, the Board may only rescind the order of release in very limited circumstances.

> [T]he parolee is entitled to retain his liberty as long as he substantially abides by the conditions of his parole. The first step in a revocation decision thus involves a wholly retrospective factual question: whether the parolee has in fact acted in violation of one or more conditions of his parole. Only if it is determined that the parolee did violate the conditions does the second question arise: should the parolee be recommitted to prison or should other steps be taken to protect society and improve chances of rehabilitation?

Morrissey v. Brewer, 408 U.S. 471, 479-80 (1972). I submit that in this case the Board was divested of jurisdiction to rescind Kelch's commuted sentence where he did not violate the conditions of release. Absent a violation, the Board lacked jurisdiction to recommit Kelch.

The Board may not revoke a release simply because additional information comes to light after the grant of commutation. Ellard v. Alabama Bd. of Pardons and Paroles, 824 F.2d 937, 946 (11th Cir.), *cert. denied,* 485 U.S. 981 (1987). If this were not so, Kelch would conceivably be subject to revocation of his release indefinitely, through no fault of his own.

The majority contends that Kelch's interest was protected by adequate procedural due process. Affording him the opportunity to be heard at a meaningful time and in a meaningful manner did not cure the fact that the Board did not have indefinite jurisdiction absent a violation of release conditions; the wording of the order "effective this date" undermines the rationale of the majority.

The majority cites McLaughlin v. Bronson, 537 A.2d 1004 (Conn. 1988) as a case similar to Kelch's, wherein the Connecticut Board of Pardons revoked the prisoner's commutation after rehearing. However, the Connecticut Supreme Court stated, "[W]e hold that the board may revoke an absolute commutation, prior to actual release of the prisoner, if the factual basis upon which the commutation was granted proves to be erroneous, and the justification for granting the commutation is thereby abrogated." *Id.* at 1006. *McLaughlin* can be distinguished from the case at hand; there is no assertion here that Kelch made misrepresentations to the Board. This is a case of additional information coming to light after the Board commuted his sentence, which is a very different situation.

This case illustrates why Supreme Court Justices should not sit on the Board of Pardons. We grant early release with one hand

and snatch it away with the other. A conflict of interest is inherent when this court is asked to review its own decisions while sitting in another capacity.

For these reasons, I conclude that the Board lost jurisdiction to revoke the early release once the order became effective, absent a violation of conditions by the parolee or misrepresentation to the Board. To retain jurisdiction violates the parolee's substantive due process rights. I cannot join the majority in finding that the Board retained the right to revoke release indefinitely upon discovery of additional information.