# FILE

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE ___NOV 07 2013___

~Madsen, C. J.~
CHIEF JUSTICE

This opinion was filed for record
at __8:00 a.m.__ on __Nov 7, 2013__

Ronald R. Carpenter
Supreme Court Clerk

## IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Personal Restraint of | )<br>)<br>) No. 87109-4 |
| | ) |
| JERRY LAIN, | ) En Banc |
| | ) |
|       Petitioner. | ) Filed    NOV 07 2013 |
| | ) |

GONZÁLEZ, J.—Jerry Lain was sentenced to a maximum of life imprisonment under Washington's former indeterminate sentencing scheme. In 2010, the Indeterminate Sentencing Review Board (board) found Lain parolable, approved his release plan, ordered parole with supervision conditions, and fixed a date for release to Iowa. Four days before that set release date, the governor canceled Lain's parole under RCW 9.95.160, which provides that "the governor may cancel or revoke the parole granted to any convicted person by the board." In response, the board added 36 months to Lain's minimum term of confinement. Lain brings both an as-applied and a facial challenge to the statute, arguing that it violates due process because it does not outline procedures for the governor to provide the inmate notice and an opportunity to be heard before the governor acts. We hold that RCW 9.95.160 is constitutional both on its face and as applied to Lain. Although Lain was entitled to

due process protections regarding cancellation of his parole, he was not entitled to a separate hearing before the governor. Due process requirements were met when he had a parolability hearing before the board and received written reasons for the governor's decision to cancel parole.

Lain argues on various other grounds that the governor's cancellation was unlawful, and he contends that the board abused its discretion in extending his minimum term. We reject Lain's other arguments and dismiss his personal restraint petition.

## FACTS/PROCEDURAL HISTORY

In 1982, Lain, an offender who had absconded from Iowa, stabbed Richland police officer Mike Fitzpatrick, then seized the officer's handgun and shot him in the abdomen and face. Officer Fitzpatrick survived the attack and is still a law enforcement officer. Lain was convicted in Benton County Superior Court of first degree assault and was given an indeterminate sentence with a maximum of life. The Court of Appeals affirmed the judgment and sentence in 1984.

The board initially set a minimum sentence of 240 months. Lain was considered for parole and denied in 1999, 2002, and 2006.

During his incarceration Lain had a total of 23 infractions arising from 18 incidents, mostly nonviolent. His last infraction for fighting was in 1985. He was disciplined for inciting a demonstration in 1987, and he was infraction free from 1996 to 2003, when he was disciplined for threatening correctional staff, apparently in

response to his then-recent denial of parole. His most recent three infractions were in 2004 for possession of an unauthorized tool, possession of tattoo paraphernalia, and bartering. He has been infraction free since then. By 2009 Lain had successfully completed a number of rehabilitative and employment skills programs.

A psychological evaluation in 2004 found Lain had a medium-to-high risk to reoffend. A 2005 evaluation found him a medium risk for violence and noted factors that would reduce the risk, including avoidance of alcohol and drugs and full-time employment. His 2009 evaluation was equivocal as to his risk of recidivism, and it raised questions about the accuracy of previously applied evaluation tools. That report estimated that Lain had a better than even chance to reoffend, but it was otherwise positive about his prospects. Lain has been consistently remorseful about his 1982 crime, although he disputes some of the surrounding facts, particularly the manner in which he shot the officer. The 2009 evaluation attributed the factual disputes to Lain's long-term memory of the crime being clouded by his intoxicated state at the time of the crime.

In August 2009, after Lain had served 318 months, the board found him conditionally parolable and added 24 months to his minimum term to allow for reentry programming. Lain preferred more immediate parole. The board noted the disagreement and commented that Lain was rigid in his thinking and expressed a sense of entitlement to parole. The board otherwise commended him for his considerable rehabilitative progress.

The board held another parolability hearing and decided in May 2010 that Lain was conditionally parolable to a reentry program without additional time in prison. He was expected to cooperate with the board in developing a transition plan that would eventually allow him to relocate to his mother and stepfather's rural home in Iowa. In late June 2010, the board amended its decision to find Lain parolable pending a parole plan for Iowa only. The board based its amended decision on the difficulty of finding work release approval for King or Pierce Counties "due to current tension surrounding high profile cases." Pers. Restraint Pet. (PRP), Ex. 5.

The "high profile cases" to which the board referred likely included the murders of four police officers in Lakewood. Meanwhile, Lain submitted a release plan that would relocate him to his mother and stepfather's home during his parole. Family and neighbors in Iowa promised him employment, and Lain was making arrangements to attend a chemical dependency aftercare program. The State of Iowa agreed to allow Lain to be paroled there.

The board approved Lain's release plan on November 15, 2010, noting that his projected early release date was January 8, 2011. Lain was directed to report to a designated Iowa correctional officer upon his relocation. On November 17, 2010, the board ordered Lain paroled effective December 20, 2010.

Upon learning of Lain's imminent parole, Officer Fitzpatrick lodged a complaint with "The Problem Solvers" at KOMO news in Seattle. KOMO ran a story on December 13, 2010 about Officer Fitzpatrick's opposition to Lain's parole. Noting

that the governor could cancel or revoke parole, the report said that the news station had contacted the governor's office and asked her to review the case. KOMO ran a follow-up story on December 15, quoting objections from the president of the Lakewood Police Guild and quoting the bovernor's statement of concern over the controversy. The governor's office and the board received considerable correspondence from law enforcement support organizations and individuals objecting to Lain's parole.

On December 16, 2010, the governor canceled Lain's parole and ordered the Department of Corrections not to release him, concluding that he was not sufficiently rehabilitated and was not a fit subject for parole. The governor remanded the case back to the board for further proceedings. Lain subsequently asked the governor for a hearing before her, submitting around two dozen supporting letters. She refused. On June 9, 2011, after a hearing before the board, the board set a new minimum term of 36 months (retroactive to January 8, 2011), noting that the board was constrained by the governor's order that canceled Lain's parole. Commending Lain for his cooperative and mature response to the governor's decision, the board recommended low security placement, such as camp.

Lain filed a personal restraint petition in the Court of Appeals, which the acting chief judge certified to this court. We granted review.

STANDARD OF REVIEW

To obtain relief, Lain must show that he is restrained under RAP 16.4(b) and that his restraint is unlawful under RAP 16.4(c). *See In re Pers. Restraint of Isadore*, 151 Wn.2d 294, 298-300, 88 P.3d 390 (2004) (noting that petitioners who have had no prior opportunity for judicial review are relieved of the heightened standards of review generally applied in personal restraint petitions); *In re Pers. Restraint of Grantham*, 168 Wn.2d 204, 208, 212-14, 227 P.3d 285 (2010); *In re Pers. Restraint of Cashaw*, 123 Wn.2d 138, 148-49, 866 P.2d 8 (1994). *But see In re Pers. Restraint of Bush*, 164 Wn.2d 697, 706, 193 P.3d 103 (2008) (denying relief in part because petitioner had not made a prima facie case of actual and substantial prejudice).

Lain brings both an as-applied and a facial challenge to RCW 9.95.160. Although Lain is serving an indeterminate sentence of up to life in prison for first degree assault, but for RCW 9.95.160 he would no longer be in custody. He argues that on its face, the statute violates due process because it does not establish procedures for the governor to cancel or revoke parole. PRP at 3, 23-27 ("[T]he statute is unconstitutional on its face, because it does not provide procedures to satisfy due process concerns and, therefore, '[N]o set of circumstances exists in which the statute, as currently written, can be constitutionally applied.'" (second alteration in original) (quoting *City of Redmond v. Moore*, 151 Wn.2d 664, 669, 91 P.3d 875 (2004))). A facial challenge fails if a statute can be applied constitutionally in any circumstances. *Wash. State Republican Party v. Pub. Disclosure Comm'n*, 141

Wn.2d 245, 282 n.14, 4 P.3d 808 (2000) (citing *In re Det. of Turay*, 139 Wn.2d 379, 417 n.28, 986 P.2d 790 (1999)).

ANALYSIS

Lain's sentence is governed by the indeterminate sentencing provisions of chapter 9.95 RCW. *See In re Pers. Restraint of Ayers*, 105 Wn.2d 161, 162, 713 P.2d 88 (1986). Under those provisions, the superior court sets an offender's maximum sentence and the board determines the actual period of confinement. The board sets the offender's minimum term, which establishes a date when the inmate becomes eligible to be considered for parole. RCW 9.95.011, .040, .052; *see also* WAC 381-40-100; *In re Pers. Restraint of Powell*, 117 Wn.2d 175, 186 n.1, 814 P.2d 635 (1991).

The board has broad discretion but is guided by relevant statutes and its own procedures. The board cannot grant parole until it determines the inmate has been rehabilitated and is a fit subject for release. RCW 9.95.100. Otherwise, the offender is not released from custody until the maximum term has been served. *Id.*; *Cashaw*, 123 Wn.2d at 143. An offender is not entitled to parole, and the decision about whether to parole a prisoner "'may be made for a variety of reasons and often involve[s] no more than informed predictions as to what would best serve [correctional purposes] or the safety and welfare of the inmate.'" *In re Pers. Restraint of Dyer*, 157 Wn.2d 358, 363, 139 P.3d 320 (2006) (*Dyer* I) (alterations in original) (internal quotation marks omitted) (quoting *Greenholtz v. Inmates of Neb. Penal &*

*Corr. Complex*, 442 U.S. 1, 10, 99 S. Ct. 2100, 60 L. Ed. 2d 668 (1979)); *see also*

*Cashaw*, 123 Wn.2d at 143.

Additionally, the governor has the power to cancel or revoke parole:

> This chapter shall not limit or circumscribe the powers of the governor to commute the sentence of, or grant a pardon to, any convicted person, and the governor may cancel or revoke the parole granted to any convicted person by the board. The written order of the governor canceling or revoking such parole shall have the same force and effect and be executed in like manner as an order of the board.

RCW 9.95.160.

First, Lain contends that RCW 9.95.160, by its plain terms, did not authorize the governor's cancellation of his parole. Next he brings an as-applied and a facial challenge to the statute, arguing that he was denied due process and that the statute can never be constitutionally applied because it does not mandate procedures for the governor to provide notice and an opportunity to be heard. He also argues that the cancellation was unlawful because the governor abused her discretion by acting in disregard of the facts and violated his First Amendment rights by referencing Lain's communications with the board. Finally, he argues that the board abused its discretion in responding to the governor's order by adding 36 months to his minimum term.

We hold that the statute authorizes the governor to cancel parole and places no statutory limitations on that power. Under these circumstances Lain had a cognizable liberty interest in release and was entitled to due process, which was satisfied because he had a parolability hearing before the board and received written reasons for the

8

governor's decision. We also conclude that Lain's First Amendment rights were not violated and neither the governor nor the board abused their discretion. We affirm the governor and the board.

*1. Did the governor lawfully cancel Lain's parole?*

*Statutory Arguments*

Lain contends that RCW 9.95.160, by its plain terms, did not authorize the governor's cancellation of his parole. First, he argues that because parole is defined as the "portion of a person's sentence . . . served on conditional release in the community," and because Lain was not yet on conditional release in the community, there was no "parole" for the governor to cancel. RCW 9.95.0001(5); PRP at 16. But limiting the governor's power to "cancel or revoke" parole only to those cases where parole has begun is a strained and unlikely reading of the statute that we decline to adopt. Second, he argues that the governor's cancellation constituted a "parolability decision," which, he contends, is reserved solely to the board. PRP at 17. But this interpretation would render the statute a nullity. *See John H. Sellen Constr. Co. v. Dep't of Revenue*, 87 Wn.2d 878, 883, 558 P.2d 1342 (1976) (citing *Pub. Hosp. Dist. No. 2 v. Taxpayers of Pub. Hosp. Dist. No. 2*, 44 Wn.2d 623, 269 P.2d 594 (1954)). In cases of statutory interpretation, "'[t]he court's fundamental objective is to ascertain and carry out the Legislature's intent.'" *State v. Pannell*, 173 Wn.2d 222, 226-27, 267 P.3d 349 (2011) (alteration in original) (quoting *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9, 43 P.3d 4 (2002)). Lain's statutory

9

arguments are unpersuasive. RCW 9.95.160 puts no limitation on the governor's power to cancel or revoke parole.

*Due Process*

The Fourteenth Amendment protects individuals from deprivations of life, liberty, or property without due process of law, and from the arbitrary exercise of the powers of government. U.S. CONST. amend. XIV, § 1; *Wolff v. McDonnell*, 418 U.S. 539, 558, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974); *Hurtado v. California*, 110 U.S. 516, 527, 4 S. Ct. 111, 28 L. Ed. 232 (1884). The types of interests that constitute "liberty" and "property" for Fourteenth Amendment purposes are both broad and limited. The interest must rise to more than "an abstract need or desire," *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972), and must be based on more than "a unilateral hope," *Conn. Bd. of Pardons v. Dumschat*, 452 U.S. 458, 465, 101 S. Ct. 2460, 69 L. Ed. 2d 158 (1981). A protected liberty interest may arise from the Constitution itself, by reason of guaranties implicit in the word "liberty," or it may arise from an expectation or interest created by state laws or policies. *Wilkinson v. Austin*, 545 U.S. 209, 221, 125 S. Ct. 2384, 162 L. Ed. 2d 174 (2005) (citing *Vitek v. Jones*, 445 U.S. 480, 493-94, 100 S. Ct. 1254, 63 L. Ed. 2d 552 (1980); *Wolff*, 418 U.S. at 556-58). We hold that Lain had a protectable liberty interest but that he received due process.

We hold that Lain's interest in release fell within the narrow range of protected liberty interests that arise from the Constitution. Due to "the necessary withdrawal or

limitation of many privileges and rights" that results from lawful incarceration, *Price v. Johnston*, 334 U.S. 266, 285, 68 S. Ct. 1049, 92 L. Ed. 1356 (1948), protected interests that arise purely from the due process clause are restricted to "the most basic liberty interests in prisoners." *Hewitt v. Helms*, 459 U.S. 460, 467, 103 S. Ct. 864, 74 L. Ed. 2d 675 (1983), *overruled in part on other grounds by Sandin v. Conner*, 515 U.S. 472, 115 S. Ct. 2293, 132 L. Ed. 2d 418 (1995). The due process clause does not confer a liberty interest in freedom from state action taken within a prisoner's imposed sentence. *Sandin*, 515 U.S. at 480. Thus, the Constitution itself does not guarantee either parole or good-time credit for satisfactory behavior, nor does it protect against either the transfer from one prison to another or "administrative segregation" within a particular prison. *Greenholtz*, 442 U.S. at 7; *Wolff*, 418 U.S. at 557; *Meachum v. Fano*, 427 U.S. 215, 223-24, 96 S. Ct. 2532, 49 L. Ed. 2d 451 (1976); *Hewitt*, 459 U.S. at 467. But once an individual has been released into society under the constraints of either parole or probation, the resulting freedom, "although indeterminate, includes many of the core values of unqualified liberty" and thus inherently falls "within the protection of the Fourteenth Amendment." *Morrissey v. Brewer*, 408 U.S. 471, 482, 92 S. Ct. 2593, 33 L. Ed. 2d 484 (1972) (parole); *see Gagnon v. Scarpelli*, 411 U.S. 778, 93 S. Ct. 1756, 36 L. Ed. 2d 656 (1973) (probation).

Physical confinement is relevant to whether an individual has a liberty interest, but the existence of a protectable liberty interest is not dependent exclusively on

11

actual physical release from custody. *See Kelch v. Dir., Nev. Dep't of Prisons*, 10 F.3d 684 (9th Cir. 1993) (rejecting argument that no liberty interest arises until actual physical release and finding inmate obtained liberty interest when his sentence was commuted by formal order); *Patuxent Inst. Bd. of Review v. Hancock*, 329 Md. 556, 620 A.2d 917 (1993) (finding liberty interest flowed from order of parole, prior to release); *Monohan v. Burdman*, 84 Wn.2d 922, 929, 530 P.2d 334 (1975) (holding that "once parole or a promise of parole has been granted in the form of a tentative release date, we are satisfied that the prospective parolee enjoys a unique status and is deserving of minimal due process safeguards before cancellation of that date"). The need for flexibility in prison administration, including the administration of a parole system, is certainly substantial, and a liberty interest does not flow from every recommendation to grant parole. *See Jago v. Van Curen*, 454 U.S. 14, 20-21, 102 S. Ct. 31, 70 L. Ed. 2d 13 (1981) (holding per curiam that no liberty interest was created either by Ohio statutes or by the "'mutually explicit understanding'" of parole board and inmate that inmate would be granted "'shock parole'"); *Inmates of Orient Corr. Inst. v. Ohio State Adult Parole Auth.*, 929 F.2d 233 (6th Cir. 1991) (no liberty interest where board agreed to grant parole on or after a specific date subject to approval of a release plan); *Berrien County Prosecutor v. Hill*, 298 Mich. App. 404, 827 N.W.2d 407 (2012) (no liberty interest where board's parole order was under review by circuit court as part of contemplated parole procedures). But where parole has been ordered or a sentence commuted, several courts have found that an inmate acquires a liberty

12

interest that attaches before he or she steps foot out the door. *Kelch*, 10 F.3d at 688; *Hancock*, 329 Md. at 592. Not only was Lain found parolable by an administrative decision, but his release plan was approved and an order was signed by the board members; at that point his liberty interest amounted to more than a "unilateral hope." *Dumschat*, 452 U.S. at 465. To determine whether due process requirements apply, we "'look not to the "weight" but to the nature of the interest at stake.'" *Greenholtz*, 442 U.S. at 7 (quoting *Roth*, 408 U.S. at 570-71). Liberty from bodily restraint is at the core of the due process clause, and although Lain's interest prior to actual release is more minimal than that of a parolee, the nature of the interest is substantially similar.

The State argues that there is no state-created liberty interest here because the statute does not limit the governor's discretion to cancel parole. By enacting a law that places substantive limits on official decision making, the State can create an expectation that the law will be followed, and this expectation can rise to the level of a protected liberty interest. *Cashaw*, 123 Wn.2d at 144. "For a state law to create a liberty interest, it must contain 'substantive predicates' to the exercise of discretion and 'specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow.'" *Id.* (quoting *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 463, 109 S. Ct. 1904, 104 L. Ed. 2d 506 (1989)); *see also Olim v. Wakinekona*, 461 U.S. 238, 103 S. Ct. 1741, 75 L. Ed. 2d 813 (1983); *Hewitt*, 459 U.S. 460. The governor's broad discretion to cancel or revoke parole

13

under the statute is not fatal to Lain's claim that he has a protectable liberty interest because the existence of that liberty interest is not derived from a guarantee under state law. *See Morrissey*, 408 U.S. 471 (where state law provided that paroled prisoners are subject at any time to be returned to the institution, court disregarded the applicable statutory language in finding that parolee had cognizable liberty interest). Lain was entitled to some due process protections before the State could deprive him of his interest in release on parole.

Lain received required due process under the circumstances. The "very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." *Cafeteria & Rest. Workers Union v. McElroy*, 367 U.S. 886, 895, 81 S. Ct. 1743, 6 L. Ed. 2d 1230 (1961). Consideration of what procedures due process requires under any given set of circumstances "'must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action.'" *Morrissey*, 408 U.S. at 481 (quoting *McElroy*, 367 U.S. at 895). Specifically, we must consider (1) the individual's interest, (2) the value of specific procedural safeguards in protecting against erroneous deprivation of that interest, and (3) the State's interest, including fiscal and administrative burdens of specific procedures. *Bush*, 164 Wn.2d at 705 (applying the standard from *Mathews v. Eldridge*, 424 U.S. 319, 334-35, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976), to determine what process was due when governor revoked a conditional commutation). Given an inmate's limited liberty interest under

14

the circumstances, the nature of the governor's evaluation process, and the State's substantial interest in public safety, due process was satisfied when Lain had a hearing before the board, the governor limited her review to that record, and the governor provided written reasons for her decisions.

Lain likens the governor's cancellation of his parole to the parole revocation proceedings that were at issue in *Morrissey* and *Monohan* and argues that he is entitled to the same protections as in those cases. In *Morrissey*, the Court noted that a parole revocation inflicts a "'grievous loss'" on a parolee—who might be gainfully employed and have "other enduring attachments of normal life." *Morrissey*, 408 U.S. at 482. The Court also considered the State's overwhelming interest in being able to return a parole violator to imprisonment without the burden of a new adversary criminal trial as well as the State's interest in not having parole revoked because of erroneous information. Balancing these considerations, the Court concluded that "[w]hat is needed is an informal hearing structured to assure that the finding of a parole violation will be based on verified facts and that the exercise of discretion will be informed by an accurate knowledge of the parolee's behavior." *Id.* at 484. Due process in the parole revocation context requires written notice of the claimed violations of parole, disclosure to the parolee of evidence against him, an opportunity to be heard in person and to present witnesses and documentary evidence, the right to confront and cross-examine adverse witnesses, a neutral and detached hearing body, and a written statement by the fact finders as to the evidence relied on and the reasons

15

for revoking parole. *Id.* at 489. The nature of the proceedings at issue in this instance and the interests involved are sufficiently different from *Morrissey* such that we decline to impose its requirements.

Under the first *Mathews* factor, an inmate's liberty interest in parole after approval but prior to release is more minimal than that of a parolee who has been released and is enjoying conditional freedom. *See Monohan*, 84 Wn.2d at 927-28. Unlike for a parolee, who "may have been on parole for a number of years and may be living a relatively normal life at the time he is faced with revocation," *Morrissey*, 408 U.S. at 482, the deprivation of expected parole for an inmate who is still incarcerated does not "then and there work any change in the conditions of his liberty," *Wolff*, 418 U.S. at 561.

The second *Mathews* factor requires us to consider the value of additional procedures in preventing erroneous deprivations of liberty. In this case, the value would be more symbolic than substantive. The governor's evaluation did not require a retrospective factual determination about whether Lain had engaged in particular conduct, like in the parole revocation proceedings at issue in *Morrissey* and *Monohan*; rather, her decision involved a limited review of the record developed before the board and an independent, discretionary determination that Lain would pose an unreasonable risk to public safety if released on parole. Lain received a hearing before the board, where he had the opportunity and every incentive to present his best case for parolability. That hearing and the governor's limited review helped assure

that the governor's discretionary decision was based on verified facts and informed by accurate knowledge of Lain's behavior, minimizing the risk that a determination about parolability was arbitrary and capricious. *See Morrissey*, 408 U.S. at 484. Lain fails to identify anything meaningful that would be different in a second hearing before the governor. He relies on *Moore*, 151 Wn.2d 664, where we held that statutes providing for the mandatory suspension of drivers licenses without an administrative hearing violated procedural due process. But the nature of the mandatory drivers license suspension proceedings is more like parole revocation in *Morrissey*, involving a retrospective factual determination, than a governor's decision to cancel parole. *Cf. id.* at 668 (relevant statute provided that "[t]he department shall suspend all driving privileges of a person when the department receives notice from a court . . . that the person has failed to respond to a notice of traffic infraction" (alteration in original)). In that case, we also identified a "significant risk of error," including "misidentification, payments credited to the wrong account, [and] the failure of the court to provide updated information when fines are paid." *Id.* at 673-75. Lain contends that had he been provided with a hearing before the governor, he would have presented favorable references, described his rehabilitative efforts, and shown his strong plan for release into the community. But Lain made these efforts before the board, and it was that record on which the governor relied in making her discretionary decision.

17

Finally, the third *Mathews* factor requires us to consider the State's interests, including the burden of additional administrative proceedings. The State has an overwhelming interest in protecting public safety and preventing an unrehabilitated prisoner from being released on parole, and the burden of an in-person hearing before the governor is significant. Given an inmate's limited liberty interest under the circumstances, the nature of the governor's evaluation process, and the State's substantial interest in public safety, due process did not require the governor to hold a second parolability hearing. Lain received the process he was due when he had a hearing before the board and received written reasons for the governor's decision. *See In re Habeas Corpus of Arafiles*, 6 Cal. App. 4th 1467, 1479-81, 8 Cal. Rptr. 492 (1992) (holding that where governor's review is limited to record before the parole board and the governor considers the same factors as the board, inmate is not entitled to a second parolability hearing before governor); *Styre v. Adams*, 645 F.3d 1106, 1108 (9th Cir. 2011).

*Abuse of Discretion*

Lain argues that the governor abused her discretion by acting in disregard of the facts and basing her decision to cancel parole on pure speculation. We have held that the board abuses its discretion when it does not follow its own procedures or acts in total disregard of the facts. *Dyer* I, 157 Wn.2d at 363. The statute provides no guidelines to limit the governor's discretion or procedures to follow in making her

determination. Thus, we will review whether the governor acted in total disregard of the facts.

Lain relies on *Dyer* I for his argument that the governor abused her discretion. In *Dyer* I, the board found Dyer—an untreated sex offender—not parolable, and we faulted the board for justifying its decision with "speculation and conjecture." *Id.* at 362-63, 369. Dyer had demonstrated good behavior in prison, but the board was concerned that his good behavior was "consistent with 'the calculating nature of [his] behavior' during [his crimes]." *Id.* at 362. The board also considered evidence from psychological tests that Dyer's risk for reoffense had been ameliorated but nonetheless was concerned that Dyer might have learned how to manipulate psychological tests. *Id.* We found error in the board's reliance upon "unsupported notions that Dyer manipulated the psychological evaluations and poses a high risk of reoffense because of his good behavior in prison and the nature of his crimes," and we ordered the board to conduct a new parolability hearing and base its decision on the evidence and testimony presented. *Id.* at 368-69. When the board conducted another parolability hearing and again denied parole, we affirmed the board's decision, which was based on the objective fact that Dyer remained an untreated sex offender and that "'without an exploration and understanding of the behaviors that directly resulted in his incarceration, he remains at risk to repeat those behaviors in the community.'" *In re Pers. Restraint of Dyer*, 164 Wn.2d 274, 288, 189 P.3d 759 (2008) (*Dyer* II).

Here, the governor's order demonstrated that she considered all the evidence presented to the board, and she supported her decision that Lain was not rehabilitated and posed an unreasonable risk to public safety with objective facts. The governor's order noted that she considered positive factors, including Lain's education and vocational experience as well as programming for anger/stress management and nonviolent communication, and had continuing concerns based on the nature of Lain's crime (which was violent and occurred five months after he was released on parole in Iowa), Lain's history of violent behavior in adolescence and while incarcerated in Iowa, his history of infractions while incarcerated in Washington, a 2009 forensic risk evaluation that placed Lain at medium to high risk of recidivism for both general and violent crimes, and his statements to the board that reflect resistance to the board's direction. These are objective facts rather than the kind of unsubstantiated notions relied upon in *Dyer* I. Lain argues that the governor disregarded positive portions of the 2009 psychological report. While the report notes that the tests placing Lain at medium to high risk for recidivism made that determination by comparing him to individuals who had not been incarcerated for as long as he had, we cannot say that the governor's evaluation of the evidence before her was unreasonable. *See In re Pers. Restraint of Myers*, 105 Wn.2d 257, 265, 714 P.2d 303 (1986) (noting that where the record reveals the basis for a discretionary decision of the board, the court "'will hold that discretion is abused only where it can be said no reasonable man would take the view adopted'" (quoting *State v. Hurst*, 5 Wn. App. 146, 148, 486 P.2d

20

1136 (1971))). Where it is evident that the governor considered the evidence before the board and supported her decision with objective facts, it is not our role to reweigh the evidence and substitute our own discretionary judgment. *See In re Pers. Restraint of Eckmann*, 117 Wn.2d 678, 695, 818 P.2d 1350 (1991).

*First Amendment*

Lain contends that the governor's order violated his First Amendment right to access the courts by referencing letters that he wrote to the board. The governor's order noted that she was concerned about "[Lain's] statements to the Board and others that reflect resistance to the Board's direction and a sense of entitlement to release." PRP, Ex. 9. The governor quoted from a letter written by Lain to the board in 1999 and from a letter he wrote in 2002 asking the board to reconsider its parolability decision. She also cited the board's 2010 decision finding Lain conditionally parolable but noting that he "seemed to be very rigid in his thinking and . . . . appeared to convey resistance to the Board's direction." PRP, Ex. 4, 22.

Lain relies on *In re Personal Restraint of Addleman*, 139 Wn.2d 751, 754, 991 P.2d 1123 (2000) (*Addleman* II). There, we found that the board violated an inmate's constitutionally protected right of access to the courts by considering his lengthy history of filing litigation and grievances against numerous defendants, including prison officials. We were concerned about "[t]he appearance that Addleman was denied parole due to his attempts to access the judicial system" and the chilling effect this could have on First Amendment activities. *Id.* at 755. Finding that denial of

21

parole constituted improper retaliation by the board, we remanded for a new hearing. In that context, we adopted a test that the Sixth Circuit had established for determining whether an inmate could claim retaliation: "(1) the plaintiff engaged in protected conduct; (2) an adverse action was taken; and (3) there is at least a partial causal relation between the protected conduct and the action." *Id.* at 754 (citing *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999)).

Application of this test from *Addleman* II is not appropriate here because unlike in that case, the governor did not rely on the fact that Lain was seeking redress from the board's decisions in order to conclude that he was resistant to the board's direction. Rather, the governor considered specific statements that Lain made. To the extent that the statements in his letters implicate his First Amendment rights, under our case law he is required to demonstrate that the board's action was in fact retaliatory and that the alleged retaliatory action advanced no legitimate penological goals. *In re Pers. Restraint of Addleman*, 151 Wn.2d 769, 775-76, 92 P.3d 221 (2004) (*Addleman* III) (where board considered "'slang dictionary'" inmate was writing) (citing *Hargis v. Foster*, 312 F.3d 404, 409 (9th Cir. 2002)). Lain fails to do so. The governor's cancellation of parole advanced the legitimate penological goal of not releasing an unrehabilitated offender into the community.

*Substantive Due Process*

Lain argues that the governor's decision violated his substantive due process rights. "[O]nly the most egregious official conduct can be said to be 'arbitrary in the

22

constitutional sense.'" *County of Sacramento v. Lewis*, 523 U.S. 833, 846, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998) (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 129, 112 S. Ct. 1061, 117 L. Ed. 2d 261 (1992)). Clearly, where Lain received due process and the governor properly exercised her discretion he does not have a cognizable claim that she violated substantive due process.

*2. Did the board abuse its discretion in adding 36 months to minimum term?*

Lain argues that the board's adherence to the governor's order and extension of Lain's minimum term constituted an abuse of discretion. We disagree. The board is endowed with broad discretion and may "redetermine the minimum term [of a prisoner] at its discretion, for a variety of reasons, any time prior to an inmate's completion of his maximum term." *State v. King*, 130 Wn.2d 517, 528 n.4, 925 P.2d 606 (1996) (citing RCW 9.95.052). We review the board's decisions to "ensure [that it] exercises its discretion in accordance with the applicable statutes and rules." *Dyer I*, 157 Wn.2d at 363. The board abuses its discretion when it fails to follow its own procedures or acts in disregard of the facts. *Id.* (citing *Addleman* III, 151 Wn.2d at 776-77). We find evidence that the board considered objective facts and complied with statutory directives.

In extending Lain's minimum term, the board stated that it had "carefully considered the factors set out by the Governor in her order canceling parole release," including a forensic risk evaluation that placed him at a medium to high risk of recidivism and the governor's determination that he "would pose an unreasonable risk

23

to public safety if he was released from prison at this time." PRP, Ex. 10. Lack of rehabilitation and "[e]vidence that an inmate presents a substantial danger to the community" are permissible reasons to deny parole and to impose a minimum sentence considered exceptional under the Sentencing Reform Act of 1981 (ch. 9.94A RCW) guidelines. WAC 381-60-160; *In re Pers. Restraint of Ecklund*, 139 Wn.2d 166, 176, 985 P.2d 342 (1999). In fact, the board is statutorily mandated to "give public safety considerations the highest priority when making all discretionary decisions." RCW 9.95.009(3); *Dyer* II, 164 Wn.2d at 296 n.8. Moreover, in exercising its discretion to determine the appropriate amount of time to add to Lain's minimum term, the board considered recommendations from several psychological evaluations that Lain participate in one-on-one counseling and the benefits of undergoing chemical dependency treatment a second time given continued concerns about relapse into chemical dependency. That the board's reasons for extending the minimum term are inconsistent with its previous parole order is not a sufficient showing that the board abused its discretion.

CONCLUSION

Lain was entitled to minimal due process protections, and he received the process he was due under the circumstances when he had a hearing before the board and received written reasons for the governor's decision. The governor considered the evidence before the board and supported her decision to cancel parole with objective facts from the record. The board did not abuse its discretion in relying on the

24

factors cited by the governor and considering the benefits of programming to determine that 36 months should be added to Lain's minimum term. Thus, we reject Lain's arguments and dismiss this personal restraint petition.

_Gonzáles, J._

WE CONCUR:

_Madsen, C.J._

_Owens, J._

_Stephens, J._

_McCloud, J._

_Wiggins, J._

_Gordon McCloud, J._

No. 87109-4


FAIRHURST, J. (concurring)—I agree with the majority that the governor

lawfully canceled Jerry Lain's parole and that the Indeterminate Sentence Review

Board (Board) did not abuse its discretion in extending Lain's prison term. I write

separately to emphasize the limited scope of the protected liberty interest the

majority finds under the Fourteenth Amendment to the United States Constitution.

The threshold question in procedural due process analysis is whether there is

a liberty interest at stake sufficient to trigger due process protections. *Morrissey v.*

*Brewer*, 408 U.S. 471, 481-82, 92 S. Ct. 2593, 33 L. Ed. 2d 484 (1972). Liberty

interests may arise from two sources: (1) the due process clause of the Fourteenth

Amendment, by reason of guaranties implicit in the word "liberty" and (2) state

laws that create an expectation or interest in life, liberty, or property. *In re Pers.*

*Restraint of Cashaw*, 123 Wn.2d 138, 144, 866 P.2d 8 (1994) (citing *Hewitt v.*

*Helms,* 459 U.S. 460, 466, 103 S. Ct. 864, 74 L. Ed. 2d 675 (1983), *overruled in*

*part on other grounds by Sandin v. Conner*, 515 U.S. 472, 115 S. Ct. 2293, 132 L.

Ed. 2d 418 (1995)). I concur with the majority that a liberty interest arises from the Fourteenth Amendment and thus I do not go further and discuss whether Washington State law creates a liberty interest.

The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." For lawfully incarcerated prisoners, only the "most basic liberty interests" are protected by the Fourteenth Amendment. *Hewitt*, 459 U.S. at 467; *see also* NEIL P. COHEN, THE LAW OF PROBATION AND PAROLE § 15:7, at 15-11 (2d ed. 1999 & Supp. 2008) (Prisoners "retain those constitutional rights not inconsistent with their status or the legitimate needs of a penal system."). If any substantial deprivation triggered the due process clause, prison officials would be hindered in their ability to take the discretionary actions needed to run the facilities. *Olim v. Wakinekona,* 461 U.S. 238, 245, 103 S. Ct. 1741, 1745, 75 L. Ed. 2d 813 (1983) (citing *Meachum v. Fano,* 427 U.S. 215, 225, 96 S. Ct. 2532, 49 L. Ed. 2d 451 (1976)). Thus, courts are generally reluctant to find prisoner liberty interests under the Fourteenth Amendment. *See* COHEN, *supra,* § 15:2, at 15-5 (in the absence of a "statutorily created liberty interest," it is "quite difficult" for a prisoner to establish a liberty interest). Nonetheless, prisoners retain "a residuum of liberty" and Lain's right to parole after all the necessary prerequisites have been completed other than actual release is a situation where an inmate's right is constitutionally protected. *Olim,* 461 U.S. at 245 (citing

2

*Wolff v. McDonnell*, 418 U.S. 539, 555-56, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974)).

It is helpful to view a prisoner's due process rights along a spectrum. On one end of the spectrum is a lawfully incarcerated prisoner. A prisoner has no inherent right to parole or to any conditional release "before the expiration of a valid sentence." *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 7, 99 S. Ct. 2100, 60 L. Ed. 2d 668 (1979). It follows that when a prisoner appears before a parole board, the prisoner does not have a liberty interest requiring the parole board to provide due process protections in deciding whether to grant or deny parole. *See id.* at 11 (noting that the possibility of parole, without a legitimate expectation of parole created by statute, gives an inmate "no more than a mere hope").

On the other end of the spectrum is a prisoner who has been actually released from prison on parole. Because a parolee enjoys a sense of freedom, a parolee has a conditional liberty interest. *See Morrissey*, 408 U.S. at 482 (A parolee's conditional liberty interest arises because the parolee has the right to work, associate with friends and family, and "to form the other enduring attachments of normal life."). A probationer also has a conditional liberty interest by virtue of the fact that he remains outside of prison. *Gagnon v. Scarpelli*, 411 U.S. 778, 93 S. Ct. 1756, 36 L. Ed. 2d 656 (1973). After a prisoner has been

3

released on parole, the State must provide due process to a parolee before it can revoke parole. *See Morrissey*, 408 U.S. at 485-89 (parolee entitled to a preliminary and a final revocation hearing). Similarly, if a convicted person remains outside of prison on probation, the State must provide due process to the probationer before it can revoke probation. *Gagnon*, 411 U.S. at 782 (probationer entitled to same due process protections as a parolee).

On the liberty interest spectrum, the parole authority's decision to rescind an order setting a prisoner's parole release date "lie[s] somewhere between" the decision to grant parole (*Greenholtz*) and the decision to revoke parole or probation (*Morrissey/Gagnon*). COHEN, *supra*, § 15:11, at 15-15 to 15-16 ("[P]etitioners have already received a favorable decision (thus distinguishing them from parole or probation applicants), but the conditional liberty represented by actual release on probation or parole has yet to occur.").

The relevant question for when due process rights attach is if the inmate has an *entitlement* to the benefit or merely an expectation or hope. *Greenholtz*, 442 U.S. at 7. An expectation of a benefit or even a mutually explicit understanding will not create a constitutionally protected liberty interest for a prisoner, no matter how grievous of a loss that reality is for him or her. *Jago v. Van Curen*, 454 U.S.

14, 17, 102 S. Ct. 31, 70 L. Ed. 2d 13 (1981).[1] There is a substantial difference between being denied a conditional liberty one desires and being deprived of a liberty one has. *Greenholz*, 442 U.S. at 9. There must be a concrete benefit the prisoner is entitled to that is not subject to any prerequisites before due process protections will be required.[2] *Id.* at 9, 11; *In re Parole of Hill*, 298 Mich. App. 404

---

[1] *Jago* and subsequent cases citing it present the fine distinction between when a benefit is an entitlement and when it is merely a hope. In *Jago*, the United States Supreme Court reversed the Sixth Circuit Court of Appeals, holding that "the Court of Appeals erred in finding a constitutionally protected liberty interest by reliance upon . . . 'mutually explicit understandings.'" 454 U.S. at 17 (quoting *Perry v. Sindermann*, 408 U.S. 593, 601, 92 S. Ct. 2694, 33 L. Ed. 2d 570 (1972)). The Court concluded that because Van Curen had no protected liberty interest under Ohio law, he was not entitled to a hearing prior to the denial of his parole. *Id.* at 21.

Subsequent cases have interpreted *Jago* to categorically deny a due process right to parole. *Evans v. Sec'y Pa. Dep't of Corr.*, 645 F.3d 650, 664-65 (3d Cir. 2011) (*Jago* holds there is "no protected liberty interest in anticipated parole"); *Patuxent Inst. Bd. of Review v. Hancock*, 329 Md. 556, 585-86, 620 A.2d 917 (1993) (*Jago* holds there is no entitlement to a parole hearing unless it is statutorily protected). However, these cases can be distinguished factually to consistently support the notion that the relevant question is whether the inmate is entitled to the right or just hopes for it. *Evans*, 645 F.3d at 665 (court held there was no liberty interest in estimated parole date); *Hancock*, 620 A.2d at 931-32 (court held there was a liberty interest in a final grant of parole).

[2] This court's decision in *Monohan v. Burdman*, 84 Wn.2d 922, 530 P.2d 334 (1975), is consistent with this framework. In *Monohan*, Phillip Monohan was granted a tentative release date and was granted a furlough in order to "undertake development of a parole plan." *Id.* at 923. While on furlough, Monohan was arrested. *Id.* Although the charges were eventually dropped, the parole board canceled Monohan's tentative release date and extended his minimum term for nine months. *Id.* at 924. This court concluded that the cancellation of a tentative parole date was a procedure to which the prisoner was entitled to minimal procedural safeguards because once a tentative release date is given it establishes a "potential conditional liberty" that must be protected. *Id.* at 927-28.

This language is seemingly much broader than the limited due process protection I advocate but it is not. First, the court considered the "tentative" date as final parole approval with the date subject to change depending only on when approval of the parole rehabilitation plan occurs. *Id.* There was an expectation that the only factor that could affect the parole date was acceptance of the plan; it was never contemplated that an infraction would lead to the extension of his minimum term. *Id.* This is consistent with the idea that once an order is final, release is no

827 N.W.2d 407, 417 (2012) (no protected liberty interest after parole date was set because circuit court review is a component of the state parole process).

Turning to the facts of this case, Lain's parole was not subject to any prerequisites. He had an approved parole rehabilitation plan and a fixed release date from the Board. Under Washington law, while the governor has the power to cancel or revoke parole, the governor's acceptance of parole is not a precondition to release.[3] RCW 9.95.160. Accordingly, there were no prerequisites to Lain's parole. This was not merely a hope; he had an expectation of release and this expectation is deserving of due process protection. The extent of this protection is still minimal, however, as we have just begun the move from one end of the spectrum to the other. Despite being entitled to due process protection, Lain was not entitled to an additional full hearing before the governor. I concur in the majority's assessment of the extent of due process protection that is required in this situation. An appellate-like review by the governor is sufficient due process protection in this situation. Lain had a protected liberty interest under the

_____

longer subject to any prerequisites and there is an expectation of release. Second, this hearing arose from a furlough violation, which the court likened to a parole revocation hearing instead of a hearing regarding whether to grant parole. *Id.* As discussed above, greater due process protections are afforded to an inmate during parole revocation hearings. Thus, the court held that a hearing regarding a furlough violation is more protected than an initial parole decision, which is also consistent with our case law.

[3]The Board is given wide discretion to handle parole decisions in Washington. The governor's power under RCW 9.95.160 is a rarely used power of intervention into the Board's discretion.

Fourteenth Amendment and a review by the governor of the record is sufficient to protect this interest.

I concur with the majority's holding that Lain had a protected liberty interest under the Fourteenth Amendment after the Board set a parole release date and there were no more prerequisites to his parole. This created an entitlement to parole, subject to due process protections. However, the governor's appellate-like review of the record was sufficient to afford these protections; a full hearing before the governor was not necessary. Because I conclude that Lain was provided with adequate due process protections, I would dismiss Lain's personal restraint petition.

Fairhurst, J.

Hunt, J.P.T.

8